Marvin Ray **SPARROW** et al., Plaintiffs,

v.

**J. C. GOODMAN, Jr., Chief of Police of Charlotte, North Carolina, et al., Defendants.**

No. 2988.

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 31, 1973.

George S. Daly, Jr., Charlotte, N.C., and Norman B. Smith, N.C. Civil Liberties Union, Greensboro, N.C., for plaintiffs.

Frank B. Aycock, III, and G. Patrick Hunter, Jr., Charlotte, N.C., for defendants J. C. Goodman, Jr., City of Charlotte, Rudy Torrence, W. R. Leonard, Lt. Robert F. Tilley, Lt. Wade Stroud, G. W. Nesbitt, Maj. Sam Harkey, and all unnamed officers of the Charlotte Police Dept.

Henry W. Underhill, Jr. and W. A. Watts, Charlotte, N.C., for City of Charlotte, N.C.

Harlington Wood, Jr., Asst. Atty. Gen., Washington, D. C., Keith S. Snyder, U. S. Atty., Asheville, N.C., Harland

F. Leathers, Washington, D. C., David B. Sentelle, Asst. U. S. Atty., Charlotte, N. C., and Jeffrey F. Axelrad, Washington, D. C., for defendants James Rowley and John H. Grimes, Jr. and all other agents of the United States Secret Service.

Charles A. Lloyd, Asst. Atty. Gen., of N.C., Raleigh, N.C., for defendant Robert M. Blackburn, Clerk of the Superior Court of Mecklenburg County, N.C.

McMILLAN, District Judge.

## I.

## PRELIMINARY STATEMENT

Plaintiffs brought this action against the federal and local defendants, alleging that they were unconstitutionally arrested and assaulted, and excluded from "Billy Graham Day" at the Charlotte Coliseum, on October 15, 1971. Hearings were conducted; evidence (six hundred pages) was taken; motions were made, briefs were filed; the case is before the court on claims of executive privilege and of Fifth Amendment privilege, and on motions for summary judgment and motions to dismiss.

This opinion and order attempts to recite the evidence, to reach factual findings, and to decide the issues presently existing among the parties, arising from a sometimes amusing but essentially grave and alarming series of events.

## II.

## SUMMARY OF EVIDENCE AND FINDINGS OF FACT

A. BILLY GRAHAM DAY IN CHARLOTTE.

October 15, 1971, was "Billy Graham Day."

In tribute to Charlotte's famous native son, the Coliseum, seating 13,000 or more, was leased by the Chamber of Commerce; a holiday (later to be made up by Saturday classes) was declared for Mecklenburg's 80,000 public school children by the Board of Education; free tickets (printed, for ordinary guests, and engraved, for those who sit above the salt) were given out; United States Senators, Governors, and other distinguished political personages were invited and attended.

President Richard M. Nixon, a friend of Dr. Graham, agreed to come and did come.

The Secret Service, and others, wheeled into action. Advance men were dispatched to Charlotte to make arrangements for presidential security. Numerous ushers were appointed by the Chamber of Commerce. A ten-mile route was plotted for the presidential caravan from the airport to the Coliseum. Conferences were held among the Secret Service and local law enforcement authorities, particularly Chief of Police Jake Goodman and his aides of the Charlotte City Police, and the Mecklenburg County Police, the State Highway Patrol, the F.B.I., and others.

The Secret Service called for manpower, and made "unreasonable demands" upon the Charlotte City Police and other law enforcement agencies. According to the local police authorities, the local police for the duration of the President's visit, made themselves unpaid and cooperative servants of the Secret Service. The gathering and the celebration were accomplished without untoward event or disruption. The President and Dr. Graham appeared and spoke acceptably to the duly admitted group inside the Coliseum. So far as the record shows, all was harmony inside; there is no evidence that any dissenting voice, sign, banner or gesture marred the occasion.

At the entrances, and outside, it was a different story.

B. THE CHARLOTTE COLISEUM.

The Charlotte Coliseum and the adjacent Auditorium are owned by the citizens of Charlotte through the Charlotte Coliseum-Auditorium Authority. The court takes judicial notice that the Coliseum was built through municipal bond funds in the early 1950's; that it is used for ice hockey, basketball, circuses, rock and roll, hard rock groups,

school commencements, baccalaureate sermons, Billy Graham crusades, presidential campaign rallies and other such functions. The Authority once had a policy of selective censorship of plays and other events, but since the case of "Hair" (Southeastern Promotions v. Charlotte, 333 F.Supp. 345 (W.D.N.C. 1971)), there have been no restrictions other than the criminal laws upon the kind of program that is allowable. The Coliseum is not a private hall. Billy Graham Day—a school holiday with the President on hand—was not a private affair.

The Coliseum seats about 13,000, has a 367-foot circular dome (once the largest in the world), and sits on the south side of Independence Boulevard in Charlotte. The main entrance is on the south side facing the large parking lot. This entrance is a rectangular, glass-enclosed area, perhaps fifty feet square (R. 567), whose doors open south onto the ramp leading to the parking lot. A great deal of the action of the day took place inside this entrance.

The Coliseum generally, according to the Secret Service, was a "secured" area. However, the gates *per se* were not part of the "secured" area! People came in through the doors holding their tickets. A few feet inside the door was another "unsecured" area where Ernie Helms, a person of muscle and dimensions adequate to play tackle for the Washington Redskins, was taking up tickets. (On this record Helms' credentials are unknown except for a Charlotte address and membership in the Veterans of Foreign Wars; he was not a member of the Secret Service nor was he admitted to be an agent of the Secret Service. When interrogated by deposition he took the Fifth Amendment and refused to testify! (R. 572))

The boundaries of the "unsecured" area were not fixed. Some of the personnel who manned it are poorly identified. It seems to have varied in size and location from time to time. It reminds one of the description in the play,

"Pal Joey," of Nate's roving crap game —"the oldest established permanent floating crap game in New York." This "unsecured" area, inside the *un*secured doors, was the open area where tickets were taken up, and where bottles and pennants were taken from visitors, and in which were carried out the numerous decisions to exclude people from the Coliseum after their tickets had been taken from them.

Those chosen for exclusion were subjected to the experience of having their valid tickets falsely and publicly pronounced "counterfeit" and then were ushered or shoved or carried bodily along a corridor of ropes and barrels and out another nearby door.

## C. THE [NOT SO FUNNY] THINGS THAT HAPPENED TO THE PLAINTIFFS ON THE WAY TO THE COLISEUM.

### 1.

### AS IT LOOKED TO THE PLAINTIFFS.

*Marvin Ray Sparrow* (R. 6 through 37), plaintiff, was an apprentice lather. He went to the Coliseum conservatively dressed in a blue shirt, tweed jacket and Schiaparelli tie. His hair was shoulder length. He was a member of an organization called the "Red Hornet May Day Tribe," an organization of young people to oppose, peacefully, the "imperialist policies" of the administration in Vietnam and also to oppose racism and sexism and the policies generally of the "ruling class." The Red Hornets had met two or three times (R. 19), and planned to go to the Coliseum as a group with banners and signs indicating their dissent. They planned no violence and had no firearms and no weapons of any kind. Sparrow arrived at the Coliseum about one o'clock in the afternoon, visited with acquaintances outside, and then got in line to enter the main entrance door. He entered the door holding a proper ticket. A large man, wearing a "Marshal" arm band, later identified as Ernie Helms, told him to stand

aside. He was directed into an alleyway marked by ropes and barrels which led east along the glass south wall and back out the south side of the building. Sparrow inquired of Helms as to the meaning of this procedure, and was told to "Shut up and stand over to the side" (R. 9). Helms demanded Sparrow's ticket and Sparrow refused to give it up until some indication was given as to whether he would be admitted. Helms took the ticket forcibly away from Sparrow, then summoned a Charlotte city policeman, Officer John Horton (R. 11, 23), and bade Horton eject Sparrow, saying, "Take this man out; we don't want him in here," or words to that effect (R. 23). Horton took Sparrow by the arm and pushed him down the roped-off corridor and out the door. Sparrow got another ticket, tried to get in again, was identified by Helms, and this time was shoved by Helms out the door (R. 11). Sparrow then took up a position adjacent to the street along which the President was to approach the Coliseum, saw the President come by and enter the Coliseum, and joined with some others in a discordant and off-key rendition of the "Star Spangled Banner," accompanied by plaintiff Robert B. Binner, Jr. on an instrument called a kazoo.

The group which gave the rendition of the "Star Spangled Banner" carried banners and posters (R. 30), including "Money changers out now"; "Yankee go home"; "Nixon joins Graham as the Church joins the State in killing people"; "Stop the war now"; "Jesus and Caesar weren't best friends" (R. 33). None of the signs were obscene. Sparrow was not arrested, but he did feel threatened, angry and intimidated by the actions of the police. Sparrow was not a threat to presidential security.

*Lawrence Reichard* (R. 37–47) was a student at Alexander Graham Junior High. He went to the Coliseum, wearing tennis shoes, blue jeans, a turtleneck sweater and shoulder-length hair, to take pictures for his Sunday School class at the Quaker Friends Meeting House.

He went inside the Coliseum, but before the President's arrival nothing was happening inside, and so he came back outside. Later, he tried to re-enter, but was denied admission. He was intercepted by Helms or one of the other marshals and was evicted through the rope-and-barrel corridor. A companion of Reichard took a picture of Helms manhandling Reichard. Helms seized the camera, tore it open, removed the film and returned the camera, damaged, to Reichard's friend. Reichard attempted to enter a third time, and on this occasion the marshal went to the extreme of reaching down inside Reichard's trousers and removing his ticket to be torn up before throwing Reichard out. Reichard is thirteen years old, and weighs about a hundred and five pounds. He was bodily evicted on two of the four occasions when he tried to enter. The only reason given for evicting him was the false allegation by Helms that his ticket was "counterfeit." An elderly woman was later admitted using the same type of ticket (R. 43). Reichard had heard of the Red Hornet May Day Tribe, but had not attended their meetings. Reichard was not a threat to presidential safety.

*Charles Lee McMahan, III* (R. 46–76) is a twenty-two-year-old janitor. He went to the Coliseum in blue jeans and boots and hair that came to the points of his shoulders. About noon, along with some others, he started distributing anti-Nixon, anti-Billy Graham leaflets. The leaflet said "Nixon is a sinner." After all the leaflets had been distributed he went inside and was evicted by Ernie Helms, who shoved him out the door. He managed to hold on to his ticket (R. 50). Later he tried to get in again and was evicted again, this time without the ticket. The marshal told him the ticket was "counterfeit" (R. 51). McMahan paraded with the banner which said, "Jesus and Caesar weren't best friends." After the President and Billy Graham had arrived and entered the Coliseum, McMahan took part in the singing of the "Star Spangled Banner"

and before the rendition was completed he was seized from behind and arrested by Charlotte city policemen and ushered to a police car. The singing was outdoors in the open air, on the edge of a street (Coliseum Drive) which runs north and south about seventy-five or a hundred feet to the west of the Coliseum. McMahan was a member of the Red Hornets and had attended their meetings. Their original intention had been to take their anti-Nixon banners into the Coliseum. They did not succeed in doing that. He felt angry and frustrated by being denied admission and being arrested. His family are members of the sponsoring Chamber of Commerce and have a Chamber of Commerce membership ticket hanging in their living room (R. 57). Two other chants which the crowd sang before the "Star Spangled Banner" rendition were "Ho Ho Ho Chi Minh, N.L.F. is going to win," and "One, two, three, four, we don't want your f_____g war." The only leaflet that McMahan passed out was the one that read "Nixon is a sinner" (R. 67). The chants "Ho Ho Ho Chi Minh" and "One, two, three, four" were described by the witness as "pretty standard phrases" in the American political vernacular (R. 71). McMahan's arrest took place about fifteen minutes after the entrance of the President into the Coliseum. There were no fighting words or threats of fights among the crowd at the time of the "Star Spangled Banner" singing. McMahan was no threat to presidential security.

*Curtis Howard Smith* (R. 76–84) was a twenty-one-year-old Davidson College student. He was dressed in a shirt, blue jeans and boots and a pullover sweater, had hair about to his shoulders, and wore a motorcycle helmet. He entered the door, submitted his motorcycle helmet for examination, presented his engraved invitation, and was duly seated. Half an hour or so later he left his seat and went to the concourse, which encircles the Coliseum inside the outer wall, and stood near a refreshment stand watching the crowd, expecting that the President would come pretty soon. He was twenty-five or so feet above the ground, and was separated by a steel-reinforced window from the place where the President was to enter. A plain clothes man came and took him by the arm (R. 79) and was soon reinforced by another plain clothes man. These people examined his ticket, falsely called it "counterfeit," took Smith to the door and shoved him out. Smith had never heard of the Red Hornet May Day Tribe (R. 80–81), had never attended their meetings, was not armed, and was surprised, disturbed and angered. Smith was no threat to presidential security.

*Robert Schlosser* (R. 84–90) was an employee of W.B.T. Radio, whose chief executive, Charles Crutchfield, was perhaps more responsible than any other individual for the day's gathering. He came with a ticket furnished by W.B.T. He was fully dressed in a suit and shirt and tie. His hair was about an inch below his ears. He made the mistake of walking into the building holding a piece of paper which some pamphleteer had handed him. He was seized by a plain clothes man and, with Charlotte policemen looking on, he was shoved out the door (R. 86). Schlosser was not a member of the Red Hornet May Day Tribe, nor of any political action group. He had no firearm, knife or other weapon. He was embarrassed at being evicted before hundreds of people. He said, "I felt angry and I felt like a stranger in my own country. I couldn't believe it was going on" (R. 89). Schlosser was no threat to presidential security.

*Nancy Ferguson* (R. 90–118), twenty-three years old, went to the Coliseum wearing a work shirt, a blue jumper, a dress and regular shoes and hose. She passed out "Nixon is a sinner" leaflets and gave out some tickets. She decided to enter and be seated along with Mark Englander and Lynn Ruch. She handed a leaflet to one person inside, and saw that man seized and evicted by Secret Service agents. She went on into the seating area and was seated. After a little while she got up and started out

and saw the witnesses Buckner and Jenkins being arrested by Charlotte city police, with two Secret Service men in close proximity (R. 92). She went to use the phone and started back to her seat, at which time she saw her companions Ruch and Englander being taken away by the police. She passed by the door to one of the ladies' restrooms and saw a policeman dragging a young woman out of the ladies' room, telling her she was going to have to leave the Coliseum. Miss Ferguson made the mistake of laughing at this procedure and was herself seized by a policeman (R. 93). She asked why, and he said, in effect:

"All right you have to go too ..... because we have been told that all you people have to leave" (R. 94).

She was taken to the entry way for questioning by Secret Service men and ordered to leave in order to avoid arrest for trespassing. The Secret Service men pushed her out the door (R. 94–95). Miss Ferguson is a Red Hornet (R. 96) and had attended the meetings. None of the banners she saw had any profanity on them. She had no weapons. She was not searched at any time. She felt oppressed and discriminated against (R. 97). On cross-examination (R. 101) about an irrelevant leaflet, which was not even in evidence at the Coliseum, she admitted (figurative) agreement with the leaflet's stated objective "To confront the pig and smash and kick Nixon out on his ass," but she said it was only a figure of speech because, she said, (R. 101) "I wouldn't touch him." The only leaflet she passed out was the "Nixon is a sinner" leaflet. The people she identified as Secret Service men wore lapel pins with a red, yellow and blue three-cornered label. (Secret Service Officer John Grimes testified later that these pins were the Secret Service identification for the day.) She put the number of Secret Service agents at the south entrance (R. 112) as about ten, in addition to Charlotte policemen and people wearing "Marshal" arm bands. Nancy Ferguson was no threat to presidential security.

*Mark Englander* (R. 180–192), age twenty, and a student and receptionist at Central Piedmont Community College, went to the Coliseum dressed in green shirt and pants, and a white tie. His hair grows substantially below his ears but not to his shoulders. He and a friend, Tommy Lynn Ruch, entered and were given seats behind the podium. Englander was reading a newspaper and also had some leaflets which said "Nixon is a sinner." They sat behind the witness Wilson and engaged in conversation. A Secret Service man pointed him out to a Charlotte policeman (R. 182), and the policeman approached and spoke to Ruch and told him he had to leave and, addressing Englander, said, "You, too, Goldilocks" (R. 183). Englander started to discard his newspaper just as they were leaving the building and a Secret Service agent took the rest of his leaflets from him and threw them in a trash can saying, "Those go out, too." Englander said that he was a member of the Red Hornets and had been to two meetings and that the purpose of the group at the Coliseum was to show their dissent peacefully and nonviolently—by leaflets outside and by banners inside. However, he concluded not even to try to take his banner inside, and did not try to take it in. He had no weapons. He was not searched as he entered. He felt that his treatment was discrimination against him as a white middle-class male with long hair, and that he felt that he had as much right as anyone else to see Mr. Nixon and Mr. Graham. As far as the witness could observe no one brought any banners into the Coliseum (R. 187, 188). The police gave no answer to the question why they were evicting the witness from the Coliseum. The policeman simply said (R. 190) that they "were told to tell you to do so, to leave." Englander was no threat to presidential security.

*Thomas Lynn Ruch* (R. 285–298), twenty-five years old, an unemployed accountant with a moustache and hair almost to his shoulders (R. 286), went to the Coliseum with Nancy Ferguson and

Mark Englander. They entered and got a coke at a concession stand and a man came up and handed Ruch a "Jesus tract." Two "men in suits" came up and led the pamphleteer away. Ruch and his friends took seats. They were watched for some time by a Secret Service man with a walkie-talkie. After the Secret Service man had made a call on the walkie-talkie, some Charlotte city police entered and spoke to the three women in front of him and to Englander and told them all they would have to leave. The police said to Englander, "Come on, Goldilocks, you too." The witness then went outside and joined the group that were present when Miller, Binner and McMahan were arrested. Ruch was wearing a red arm band about an inch and a half or two inches wide (R. 290), but no buttons. Ruch saw more than twenty officers or operatives in the Coliseum with the wires in their ears. On the outside he saw another dozen or so such men with suits and lapel pins and ear phones or walkie-talkies. He also saw a scuffle near the Coliseum door at the foot of the walkway between these men in suits and a priest. Some of the police officers carried walkie-talkies, he thought (R. 292). One of the women sitting in front of his group went into the bathroom on the way out of the building and an officer followed her into the bathroom (R. 296). Tommy Lynn Ruch was no threat to presidential security.

*James Miller* (R. 118–142), age twenty-two, was an unemployed pantechnicon (R. 119). He visited the Coliseum (wearing blue jeans, boots, a grey T-shirt and hair that touched his shoulders), seeking contact with the Red Hornet May Day Tribe. When he arrived about one o'clock there was a considerable commotion in the entrance. Some were being excluded and some arrested (R. 120). Rather than try to enter, he got a banner and joined the Vietnam Veterans Against the War and the Red Hornets group outside the Coliseum displaying banners and chanting. While the chant was in progress he was seized and arrested for alleged disorderly conduct by Lt. Wade Stroud of the Charlotte Police Department, and his flag or banner was confiscated by another policeman. When arrested he was in the fifth or sixth row of people standing beside the street. He had attended one Red Hornet meeting and a press conference (R. 126). He had no weapons. He was searched that day, but not until *after* he had been arrested for the alleged disorderly conduct and taken to the police car. He was also searched at the jail. He did not try to enter the Coliseum because he realized people were being evicted and perhaps arrested and he did not want to be arrested. He had not recovered his flag from the police department at the time of trial; police spokesmen had denied knowing what happened to it. Crowd reaction to the chants and songs was varied; some smiled, some were angry, some were upset. Miller remained in custody for about two hours and was released on bond (R. 138). The Red Hornet May Day Tribe were trying to figure out a way to stop the Vietnam war and had participated in a mass, non-violent civil demonstration in Washington the previous year, and they felt that some public demonstration in Charlotte was indicated. The purpose of the demonstration was not deliberately to cause enough disturbance to get arrested. There were no fights in the crowd nor any threats of fights that the witness observed. James Miller was no threat to presidential security.

*John Knox Wilson, Jr.* (R. 143–163), age twenty, a student at Davidson College, went to the Coliseum with a conservative suit, tie, shirt and boots, but with hair down to his shoulders. He was accompanied by a young lady in a full length gingham dress. Both had tickets which they had obtained from the Davidson Peace Coalition. Wilson had a black arm band and a blue May Day button and a blue moratorium button in his pocket. They entered and were accosted by Secret Service representatives, who patted Wilson down and

seemed undecided whether to let him in. They went on in the Coliseum without further hindrance and took seats along with several other young people. Wilson's companion put on a button that read, "War is not healthy for children or other living things." Twenty minutes or so later Wilson put on his black arm band. Secret Service men had had Wilson and his group under observation during this time. Immediately after he put on the arm band, the Secret Service observer signaled to a policeman who came up and said, "All right, let's go." When asked why, the policeman said, "The chief will have none of this." Wilson's girl friend was also ordered out. They were escorted to the door by two city policemen. Secret Service and sheriff's department officials were also present. A Secret Service operative took their pictures while they were being escorted past a stairwell. Once outside, Wilson picked up a poster and carried it for a while and then joined the observers where the arrests were taking place out on the street. When the ceremony ended inside the Coliseum, he stood close to the walk that leads east from the Coliseum to the Auditorium and gave a "power salute" as the President walked by. The President stopped, he said, and said to him, "I'm glad you're here." Then Mrs. Graham and Mrs. Nixon came by and scowled at him (R. 151). Wilson is not a member of the Red Hornet May Day Tribe. He had no knife, gun or other weapon. He felt that he had been intimidated to try to keep him from showing dissent without disruption. He refused to take part in the kazoo band operation and said that his intention was to show dissent nonviolently and silently. He refused to take part in anything which might constitute a disruption or cause a disruption. The only raising of voices he heard was by a lady with a Bible who was trying to convert him to save his soul, and that lady was very mad at him for demonstrating (R. 154). He saw no fights and no violence of any kind. Miller, Binner and McMahan were just three voices among hundreds; he could see no reason for their selection to be arrested. Wilson was no threat to presidential security.

*Robert Bronson Binner, Jr.*, age twenty-three (R. 163–180), works at the Crazy Horse Book Store on Sixth Street opposite the Charlotte Public Library. He went to the Coliseum in a plaid shirt and tie with a pair of newly pressed blue jeans and shoes and a hat, and with hair six or eight inches below his shoulders. At the Coliseum he distributed "Nixon is a sinner" pamphlets. He got in line to enter the Coliseum and displayed his ticket. Ernie Helms took the ticket and called it "counterfeit," and immediately afterwards a Charlotte policeman took him by the arm and escorted him to the side door and out. Twenty minutes later, with another ticket, he tried to enter again and met the same fate and was again escorted out by police officers (R. 166). Binner then went outdoors and whiled away the time until the President approached, and then joined the group that were chanting the "Star Spangled Banner" and other songs. He waved a red, blue and yellow National Liberation Front banner. While the "Star Spangled Banner" was being concluded, he was arrested by a Charlotte city policeman. The President's limousine had already passed his location several minutes before he was arrested. There were no fights and no threatening words by anyone. Binner is a member of the Red Hornets group. He went to the Coliseum intending to carry a banner and play his kazoo. The banner he took read, "Freeze Nixon, not wages." He had no weapons. No one searched him, either of the times he tried to enter the Coliseum. Binner was no threat to presidential security.

*James William Lutz* (R. 220–227), Post Commander of the Veterans of Foreign Wars in Charlotte, appeared, represented by Attorney Charles F. Coira, and identified Ernie Helms as a member of the V.F.W.

*Ron Nichols* (R. 218–221), *C. E. Acuff* (R. 192), *James W. Holt* (R. 195), *Robert Sisk* (R. 208), *John McCachren*

(R. 211), and *Cecil C. Spencer* (R. 216), testified as to their work as ushers. Many (fifty-three) ushers were recruited by John McCachren (R. 218). None contributed much information except Holt, who identified the persons excluded from the Coliseum as mostly young and wearing long hair (R. 201). He also observed one person who was "kind of picked up and helped out a little bit . . ." (R. 206).

*Mary Herrera* (R. 227–235), is a student at the University of North Carolina at Charlotte. She went to the Coliseum with her nine-year-old son who wanted to see the President and Billy Graham, he thinking they were "superstars." She obtained a ticket and started to enter the Coliseum with some other young people she knew. She was admitted but some of her companions were shepherded behind the eviction ropes, and their tickets were torn up. Some of the officials took a picture of one of her friends who had been put behind the ropes and was being evicted. She heard some of the officials refer falsely to the tickets as "counterfeit" even though their tickets had come from the same source as Mrs. Herrera's. A fellow student on the outside of the glass south wall came to the wall and attempted to communicate with her, and Mrs. Herrera told the person on the outside to "write it down" (R. 232). Then a plain clothes man came up behind her, grabbed her arm and pocketbook, handed the pocketbook to another man who searched it, and then hollered to another man and said, "Get her out of here" (R. 234). She was taken by the arm and pushed out, along with her child. She caused no commotion until she was arrested and ushered out. Mary Herrera was no threat to presidential security.

*Katie Lane* (R. 235–240), age sixteen, is the daughter of a well-known Charlotte lawyer. She went to the Coliseum in conservative dress. Someone handed her leaflets about the Nixon price freeze. One of the members of her group had a leaflet in his hand. A man "checked our pocketbooks" and asked if they had weapons or drinks or food. They started walking through and "this man" came over and asked if all of the group were together, and he then took their tickets and pushed them out the door. Miss Lane's companions were all high school children. She was not a member of the Red Hornet May Day Tribe and had never heard of it. She had no weapons. She went back to the Coliseum door and asked the man why they were thrown out and he simply closed the door on them. Miss Lane "was floored." "I didn't understand it at all" (R. 239). Katie Lane was no threat to presidential security.

*Larry Shapiro* (R. 241–254), age twenty-five, a Vietnam war veteran, was a student at the University of North Carolina at Charlotte under the G.I. Bill of Rights. He went to the Coliseum with the local chapter of "Veterans Against the War." He wore an Army fatigue jacket and blue jeans and boots, and his hair was long, touching his shoulders. He attempted to enter the Coliseum with a ticket. He *and the other fifteen members of his group* were denied access, while other people were admitted. He indicated that the witness McCachren (see R. 211–216) instructed a black police sergeant to close the door and deny admission to him and his group. Shapiro was also a member of the Red Hornet May Day group. He had no weapons. The black police officer "said he was a veteran and said he was sorry, but he was just following orders" (R. 246). He didn't think any of the fifteen veterans got into the Coliseum, and if they did, they didn't stay in long. Shapiro was in the service almost three years, two of them as an Army officer, and had served in Southeast Asia. He testified that there had been considerable advance publicity to the effect that Billy Graham and President Nixon were coming to the Coliseum and that it would be open to the general public for anyone who had tickets. Larry Shapiro was no threat to presidential security.

*Tommy Lee Buckner* (R. 254–285), age nineteen, a chicken cutter and packer, rode his bicycle to the Coliseum. He was wearing blue jeans, boots and a jacket, and a shirt and hat. His hair hung several inches below his shoulders. He walked around and talked to friends and to one of the Secret Service men. He said (R. 257) that he asked the Secret Service man why he was wearing the colors (blue, red and yellow) of the N.L.F. (National Liberation Front). He enjoyed the conversation and the Secret Service man's response. Later he passed out some "Nixon is a sinner" leaflets. He went to the door, gave his ticket to a heavy-set man in a suit, and then was shunted off to the exit corridor and evicted. He got another ticket and tried to enter along with Polly Paddock, a newspaper reporter. Both he and Miss Paddock were evicted, through the same door through which he had previously been evicted. The third time he tried to enter he was pushed back by Sergeant Wilson of the Charlotte city police (the man who later arrested him). As Sergeant Wilson made the arrest he said to Buckner, "Look, I haven't got nothing against you personally you know. The Secret Service just gave us a job to do . . ." (R. 261). He asked Sergeant Wilson why he was under arrest, and Wilson said, "For inciting a riot" (R. 263). Buckner was escorted out by Officer Aderholt after being handcuffed. He raised his handcuffed hands and said "This is the freedom I've heard so much about" (R. 264), and was charged with thereby making an obscene gesture (R. 374–375)! This impressed him as resembling other "fascist techniques" (R. 266). He felt very much oppressed. Buckner was not a Red Hornet. Sergeant Wilson had the witness in handcuffs and in custody before turning him over to another officer, Lieutenant Tilley. Tommy Lee Buckner was no threat to presidential security.

*Tom Alsop* (R. 299) testified as to photographs he took on the occasion.

Witnesses *Stultz, Herndon, Johnston, Mr. Fitzgerald* (R. 303) and *Miss Fitz-gerald* were tendered to testify generally in corroboration of the pattern of exclusion already described. Cross-examination was waived (R. 303).

*Tom Todd,* a former F.B.I. agent and employee of Radio Station W.B.T., was likewise tendered and cross-examination was waived (R. 390, 391).

*Archie L. Haney, Jr.* (R. 303–314), plaintiff, testified that he tried to enter the Coliseum with a valid ticket and was turned away by a "U. S. Marshal" (Ernie Helms), who pronounced his ticket "counterfeit" and called upon a Secret Service agent wearing a triangular pin who escorted him out the door. Haney held on to his ticket. The witness observed Helms taking up other tickets and calling them "counterfeit." Archie Haney was no threat to presidential security.

*Grady Landrum* (R. 392–412), a plaintiff, was a twenty-year-old Central Piedmont College student, wearing blue jeans, blue jacket, a shirt, and shoulder length hair (R. 405–406). He came without leaflet, placard, sign or gang, but in company with two college girls. Ernie Helms seized and tore up their tickets, falsely pronounced the tickets counterfeit, and evicted them. Landrum got another ticket and tried to get back in and was evicted twice more. He saw Helms exclude perhaps twenty other people and heard Helms use various obscenities and call one victim a "son of a bitch" (R. 397). Police and Secret Service men stood by watching these evictions, and never interfered (R. 401). Police and Secret Service agents assisted Helms in excluding Landrum. He observed a group of policemen close the outer door once on signal from Secret Service agents. Grady Landrum was no threat to presidential security.

## 2.

## AS IT LOOKED TO THE LOCAL AUTHORITIES.

*Charles H. Crutchfield,* president of the Jefferson Standard Broadcasting Company, testified by deposition that

the Chamber of Commerce, of which he was president, had conceived the idea of Billy Graham Day. They invited Dr. Graham and President Nixon, arranged for two classes of free tickets, requested the School Board to declare a holiday, and made arrangements for the Coliseum for the public meeting and for the nearby Auditorium for a more restricted later gathering.

The Chamber of Commerce had nothing to do with crowd control and had no policy to exclude anyone.

The Secret Service and White House advance men, however, said they had some "Intelligence operations" reports that demonstrations might occur, and the local Secret Service chief, Mr. Grimes, and Mr. Lyda, the White House Secret Service man, and the presidential advance man, Mr. Hinkle, made a decision to check "long hairs" and possible demonstrators; and Lyda reported that the situation was "in hand."

The Secret Service was "in complete charge," according to Mr. Crutchfield.

*M. J. Wilson* (R. 315–341), a sergeant in the Charlotte Police Department, was on duty at the Coliseum. He was stationed about twenty feet from the main south door, and it was his job to take bottles, sticks, glass, cans or anything that could be thrown from people entering the Coliseum. He saw Tommy Buckner being escorted towards him by Ernie Helms and another officer, and he heard Buckner say, "Hypocrites and Baptist bastards" (R. 316), and when he heard that, Wilson stopped what he was doing and placed Buckner under arrest for "disorderly conduct." The "shouting manner" in which Buckner spoke distracted the crowd and disturbed some "old ladies" near him who were trying to get in and who were "hollering and telling us to get rid of him" (R. 316). Helms already had Buckner by one arm when Officer Wilson first saw him. Wilson had not seen Buckner misbehave except for his language, but upon the bidding of Ernie Helms he turned Buckner over to Officer Aderholt and in-structed Aderholt to charge him with disorderly conduct. Buckner's shouted words were not the loudest words that Wilson had heard that day. Wilson told Buckner (R. 321) that there was nothing personal about this, but that "I wasn't going to allow this, that the Secret Service was in charge of this building today and we were not going to allow this to go on."

Wilson also said that he told Buckner (R. 327) that

> "We were not going to allow you people to come out here and screw up the works."

Buckner was the only person Wilson arrested that day. Wilson had been told by Major Harkey, his commanding officer, that the Secret Service was in charge of the building (R. 322). Ernie Helms was not the only person in the area with a "Marshal" arm band on his arm. The police, Wilson said, had no instructions about who would be admitted and who would not be admitted. Wilson and other police officers were instructed beforehand (R. 330) to recognize Secret Service agents by the three-colored triangular pins that they would be wearing. All of those to whom he spoke upon the assumption they were Secret Service agents did turn out to be Secret Service agents.

Both Secret Service agents and persons with "Marshal" arm bands were taking up tickets at the door and were evicting people (R. 332–333). Upon request of the marshals and the Secret Service agents, Mr. Wilson did assist in evicting persons who had been turned aside (R. 333). Although force was not used, Mr. Wilson said (R. 333), "I *would have* if they had resisted." He said "I didn't decide who went and who stayed, but I assisted them if they needed help" (R. 334). Wilson saw two Secret Service agents evict one young man by carrying him with his feet and arms both off the ground. Wilson did observe Secret Service agents taking up tickets at the south door. Charlotte police officer Rudy Torrence did escort some peo-

ple out. The Secret Service people were not observed to make any arrests (R. 341).

*Lieutenant Robert Tilley* (R. 341–362) was questioned at length about the arrests of Tommy Buckner and John Jenkins. He did not observe any unlawful conduct by Buckner or Jenkins. Jenkins was brought to Lt. Tilley by Ernie Helms, and Ernie Helms asked Tilley to charge Jenkins with trespassing and disorderly conduct. Tilley did not know the scope of Ernie Helms' authority, if any, but so far as Tilley knew, Helms was not a Charlotte policeman nor a United States Marshal nor a Secret Service agent. As to Helms' authority, Tilley said (R. 345):

"Well, he seemed to be in charge of letting people in the door, and I assumed that he was in charge of who come in and who didn't."

Lt. Tilley, upon Helms' bidding, instructed Officer Aderholt to charge Jenkins with two misdemeanors based upon his assumption that Helms was doing the right thing (R. 345). He had never had dealings with Helms in a position of this sort before. While Tilley was at his station in the enclosed lobby where the ticket taking and the excluding of patrons was taking place, he could watch Helms and others at work taking tickets; he could see the rope alley leading along the outer glass wall to the exit door; he could see people being refused entrance and shown the way out; he did see Secret Service men at work there; they did evict Buckner and Jenkins upon the word of Ernie Helms; he had been instructed by his superiors to cooperate with the Secret Service and work with them in any way he could. The only people Tilley excluded or helped exclude from the Coliseum were excluded upon designation by the Marshal rather than by someone recognized as a Secret Service operative.

*Officer P. H. Aderholt* (R. 363–373), of the Charlotte city police, testified about the arrests of Buckner and Jenkins. Lieutenant Tilley instructed him, Aderholt, to take Jenkins and Buckner down to the police station and charge them with disorderly conduct and trespassing (R. 364). Aderholt handcuffed both men. Jenkins raised the handcuffs aloft and said, "Is this justice or democracy?" real loud, and six or seven elderly ladies nearby said, "Lock them up, lock them all up," and Jenkins turned around and said "You sound just like my God damned mother" (R. 364). There was no other disturbance. The only words Jenkins said real loud were apparently the words "Is this justice or democracy?" (R. 364). Aderholt instructed Officer Leonard to charge both of them with trespassing and disorderly conduct and to list Sergeant Wilson and Lieutenant Tilley as prosecuting witnesses. (Ernie Helms was not apparently mentioned as a necessary witness at that time.)

Officer Aderholt testified (R. 371–372) that his instructions from the higher officials of the Charlotte Police Department were to "assist the marshals and Secret Service and anyone else that needed us while you were there."

*Officer W. R. Leonard* testified (R. 373–379) that he received custody of Jenkins and Buckner from Officer Aderholt at the press gate to the Coliseum; that he was told by Aderholt to transport Jenkins and Buckner to the jail and sign warrants for disorderly conduct and trespassing, and to list Lieutenant Tilley and Sergeant Wilson as prosecuting witnesses. Upon cross-examination with reference to the warrants against Jenkins and Buckner, it appeared that both the warrants had been embellished by indicating that the disorderly conduct consisted of "making obscene gestures" (R. 375). He also testified that pursuant to instructions by Magistrate Ellis at the Mecklenburg County Jail, he took Jenkins' camera away and took the film from it and exposed the film so that it would be useless. Buckner and Jenkins were no threats to presidential security.

*Rudy Torrence* (R. 379–389), a member of the Charlotte Police Department,

testified that he saw perhaps fifty people excluded from the Coliseum, male and female, short and long hair; that he examined the personal effects of people who were admitted; that he did see more than five people forcibly ejected from the Coliseum by the marshals, though not by Charlotte police; that he never received any instructions about who was to be refused admission; that the marshals raised their voices but the Secret Service and policemen and policewomen never did. What the marshals raised their voices about was to pass the word to other marshals about who was to be excluded from the Coliseum. He did see people shoved out the door by the marshals.

*John Horton* (R. 412–446), a Charlotte city policeman on duty at the Coliseum, saw Ernie Helms throw one man out bodily (R. 413), and he assisted Ernie Helms in that accomplishment, although he did not help carry the man bodily out the door. Helms, he said, simply picked the man up off the floor and carried him bodily out the door where Helms put him on the ground. Horton was close enough at that time to be within kicking range of the offending patron (R. 417), and was kicked "just below the waistline" but he did not charge the patron with assault on an officer nor arrest him nor make any further investigation (R. 417). Horton presumed that Helms had "authority of admittance" (R. 418). Horton assisted in evicting the patron "without having any idea whether the marshal was telling the truth or had authority" (R. 418). He assumed that Helms had the authority because he had an arm band labeled "Marshal" and was exercising the authority (R. 419). The person being evicted had long hair (R. 420). He was obstructing the ingress of other patrons and this was the reason he had to be removed, Horton said (R. 423). There were ten or fifteen marshals with red arm bands at the Coliseum that day, according to Horton. Horton identified as Secret Service men those individuals wearing a round badge with a triangular three-colored lapel pin. Some of them had wires in their ears. These men were observing the marshals checking the tickets and excluding other people, including the man who was evicted bodily by Helms. One of them opened the door so that Horton and Helms could carry the man out the door.

Mr. Horton testified (R. 432 *et seq.*) that the police officers were briefed in advance by a Secret Service man who identified himself as Butch and who wore a round tri-colored lapel pin similar to the kind identified by scores of witnesses. The police were requested to handle crowds in accordance with their crowd control policies and to pay attention to individuals coming into the Coliseum and not to allow any bottles or sticks or weapons or anything that could be thrown (R. 434). The police were to identify Secret Service men by their tri-colored lapel pins. The police had no instructions respecting the marshals or their operations (R. 436). He said no instructions were given the police at the briefing to exclude any person or persons with long hair or peculiar dress or any other particular characteristics. No instructions was given about "counterfeit" tickets. In helping evict the individual shown in the photograph Mr. Horton did not consider that he was acting under Secret Service instructions. Rather, he said, he was acting in his capacity as a police officer assigned to enforce the laws and maintain order.

*Lieutenant Wade Stroud* (R. 446–463), of the Charlotte Police Department, testified that he arrested James Miller and caused the arrest of Charles L. McMahan and Robert B. Binner, Jr. (R. 447). Binner, McMahan and Miller, he said, were members of a group of fifty or sixty, and there was a more conservatively dressed crowd adjacent to them of two or three hundred other people. He watched Binner's group for thirty-five or forty minutes or more (R. 448). He heard Binner's group using an obscene word and he called upon Officer Nesbit and others to arrest two of the men and he himself arrested Miller.

The obscene chant was "One, two, three, four, we don't want your f——g war." (The men were not arrested for their off-key performance of the "Star Spangled Banner" (R. 449)). The small group in which Binner and others were singing was not making as much noise as the larger group. He did not charge any of the people in the larger group with making too much noise, but the warrant against Binner, *et al.*, did charge them with violating the law by making loud noises. None of the actions of Binner, McMahan and Miller menaced the safety of the President, in the opinion of Officer Stroud (R. 452).

All kinds of flags were being displayed by people in both the conservative group and the Binner group. One flag in the Binner group had a peace symbol on it. None of those arrested put up any resistance to the arrest. A woman nearby did some crying but he made no effort to find out why she was crying (R. 454). (She may have been Mrs. Herrera, who had been evicted from the Coliseum with her small son and who was very much disturbed and was crying because of the way she had been treated (R. 455)). No overt acts of violence or potential violence were observed except that somebody from the larger group "apparently started over" toward the Binner group at one time (R. 455). The chants by Binner, *et al.* were "upsetting" the conservative group.

No one from the Secret Service told the police to make the arrests of Binner, McMahan and Miller.

Stroud, like Horton, testified that there had been a briefing by a Secret Service officer, at which time the police were told that they could recognize Secret Service officers by their lapel pins. The witness could not recall the shape and colors of the pin. The police were instructed to cooperate fully with the Secret Service. The police were given no instructions about who was to be admitted and who was to be denied access to the Coliseum.

*J. C. Goodman, Jr.* (R. 463–498), Chief of Police, Charlotte, North Carolina, testified that although the Charlotte police were not being paid by the Secret Service, they were acting and did act under the direction of the Secret Service in protecting the safety of the President (R. 467). That was the main objective of the police that day, he said (R. 468). Goodman had several meetings in advance of the day with Mr. Grimes and other Secret Service agents. Arrangements were made for the entire itinerary of the President and his visit to the Coliseum and the Auditorium. The police had nothing to do, he said, with the admission of people to the Coliseum. That, he understood, was to be done by the Chamber of Commerce or some "local political group." Policemen were assigned to various stations about the Coliseum. The police had had some anonymous information about the possibility of disruptions (R. 475), and the possibility that groups from Charlotte and other places might meet at the Coliseum and bring in banners, obscene and otherwise, and cause disturbances (R. 476–477).

Chief Goodman said that there was no specific mention in the Secret Service discussions of long-haired persons. He did name Marvin Sparrow as one who was mentioned in their "intelligence" reports. He had heard of the Red Hornets. He did not say what threatened dissent or disruption, if any, was traced to the meetings that Marvin Sparrow was involved in and what was traceable to other meetings elsewhere. He had no particular information regarding Davidson students. He did not recall any reference to "hippies." There was mention or discussion of "protestors" (R. 481). Personnel were to be deployed at the Coliseum and at the airport to prevent disruption. Goodman was in the presidential party and did not arrive at the Coliseum until the President arrived and therefore did not give any first-hand information as to how police manpower actually was deployed. Goodman could not remember any discussion as to who was

to be admitted to the Coliseum through the main public door. He was told (R. 485) that this was to be handled by "another group of people." Police instructions were to keep the peace. He had heard a rumor that some people allegedly had displayed an obscene banner at a meeting attended by the President in Raleigh and might try to repeat the same performance inside the Coliseum. He did not know whether such an object existed, and no knowledge or planning of such an effort was traced to any of the plaintiffs or witnesses in this case. No such object was observed at the Coliseum.

Ernie Helms did not attend any of these briefing meetings (R. 489). The Secret Service displayed various pins and advised the police about the nature and description of the pins that would be worn by Secret Service. The police provided all the manpower that they were able to provide, but they did not have enough men to provide all the manpower the Secret Service wanted (R. 491). The Secret Service did not to Goodman's knowledge instruct any of his men to make arrests for violation of state law (R. 493). The Secret Service did not ask the police to exclude on any general basis persons with any particular hair style or mode of dress (R. 497). Goodman (R. 498) was willing to cede his authority or at least some of it to the Secret Service in the area of presidential protection and to allow them to make some decisions that ordinarily the police might have made (R. 498).

*Major Sam Harkey* (R. 499–511), of the Charlotte city police, testified that the first time he saw an arm band with "Marshal" written on it was at the Coliseum rather than at the meetings beforehand. He did not know Ernie Helms. He had issued instructions to Lieutenant Stroud to arrest people who were disorderly (singing or chanting) outside the building if they continued after the President entered the Coliseum, and if the people around them were still "upset." He did not instruct the police to arrest for these alleged violations of law before the President arrived.

### 3.

### AS IT LOOKED (TO THE EXTENT DISCLOSED) TO THE SECRET SERVICE.

John Grimes (R. 517–570), a defendant, Special Agent in Charge of the Secret Service in Charlotte, was called by the plaintiffs as the last witness on the last day of the hearing. The United States attorneys objected to Grimes' even being called to the witness stand! After the objection was overruled and Grimes was called to the stand, the United States for the first time conceded (R. 515) that the Secret Service was present at the Coliseum on October 15, 1971!

Mr. Grimes testified with clarity, intelligence, candor and good humor. He identified the triangular pins which Secret Service agents wore in their lapels on the day in question, and by which other witnesses had identified Secret Service men. (One of the pins apparently did have the same combination of colors as the North Vietnamese flag!) He testified that the Secret Service agents had their counterparts or cooperating officers among the local law enforcement people; that the Secret Service were charged with the primary responsibility for the security of the President (R. 543); *that plans were made to exclude certain people from the Coliseum* (R. 548); that he refused to answer questions as to the criteria for exclusion or the description of those who were to be excluded (R. 548); that the people who took up tickets were not Secret Service men *but that the names of the ticket takers had been checked through files in Washington* (R. 551); that he had nothing to do with admission tickets; that the Secret Service had requested the police to have men available in the Coliseum to assist at different locations (R. 556); that the Secret Service made "unreasonable demands" on the police (R. 557); they did call upon the

police to assist in the security arrangements (R. 557); that Secret Service agents gave instructions as to what objects could be carried into the Coliseum (R. 557–558); that Ernie Helms (apparently chief bouncer for the event) was not a Secret Service agent (R. 560); that Secret Service agents were stationed as site "supervisors" at various places and that police officers reported to these site supervisors who would instruct the police as to duties expected of them (R. 563). He refused to say how many Secret Service people were present that day.

Arrest and eviction of persons who had already been seated in the Coliseum were done by the police upon request or bidding of the Secret Service (R. 565, 568). However, if a given individual were suspected of being a physical threat to the President (which was never shown to have been the case) the Secret Service would have taken matters into their own hands (R. 570).

## 4.

### AS IT LOOKED (TO THE EXTENT DISCLOSED) TO CHIEF BOUNCER ERNIE HELMS.

Ernie Helms' story is a mystery. He was called to testify by deposition and refused to testify, even in this civil action, claiming his Fifth Amendment privilege against self-incrimination! We know about him that he was large and muscular; that he had a Charlotte address; that he was a member of the V.F.W.; and that none of the other defendants claimed him as their own, although in carrying out his bouncer's activities he took instructions from the Secret Service and *gave* instructions to the Charlotte police. He was the chief ticket-taker and bouncer, a key figure in the events of which plaintiffs complain.

### D. CONCLUDING SUMMARY OF FACTS.

There was little conflict in the evidence. The court accepts essentially at face value the various statements of historical fact by the witnesses as outlined above; however, certain ultimate facts including questions of agency, of the reasons for the actions of particular persons, of the justification, if any, for the things that were done, and the responsibility of one person or agency for the actions of another are (for purposes of the relief herein ordered) found specifically as follows:

1. *Plaintiffs and Others Were Abused, Manhandled and Excluded from a Public Gathering Without Apparent Just Cause or Excuse.*

(a) The Coliseum is a public building; Billy Graham Day was a public event; the tickets (both first-class and second-class) contained no restrictions as to the dress, clothing, reading habits or ideology of the ticket-holders; and the Chamber of Commerce, organizer of the event, had laid down no such specifications.

(b) The plaintiffs and numerous others, as indicated by the evidence, went to the Coliseum and presented valid tickets for the event.

(c) The defendant Ernie Helms and other "Marshals" falsely and publicly pronounced the tickets of many of the plaintiffs and others to be "counterfeit" and excluded them without legal or factual basis.

(d) None of those who were excluded are shown by the evidence to have any history or record of lawbreaking or violence or disrupting public proceedings.

(e) None of those who were arrested were convicted of any crime.

(f) None of the plaintiffs and no one else at the Coliseum, so far as the record shows, were suspected of planning violence.

(g) None of the plaintiffs and no one else were suspected of bringing weapons or any dangerous materials.

(h) No weapons were found on anybody who came to the Coliseum that day.

(i) Little if any search was made for weapons as people by the thousands entered the Coliseum, except that the wit-

ness Wilson was "patted down" and women carrying handbags were requested to open their handbags as they were admitted so that the ushers or bouncers could look in the handbags. Even the people arrested were not searched until after they had been arrested for alleged disorderly conduct and in one case the search did not take place until the arrestee had been taken to the police station several miles away.

(j) If violence by the plaintiffs and people of their general description were anticipated, it would appear to be a serious lack of precaution for presidential safety to pass thousands of people through the gates without search for handguns.

(k) No reason of presidential security or of national security or of crowd safety was advanced to justify the way the plaintiffs were treated.

2. *The Secret Service Was In Charge Of Those Exclusions.*

(l) The Charlotte city police were dedicated for the day to serve the wishes and obey the instructions and orders of the Secret Service. Numerous patrons, including various plaintiffs, were excluded from the Coliseum, some by bodily force, by Charlotte city police upon the instructions or bidding of various members of the Secret Service. The city police were on those occasions acting in concert with and in furtherance of a common design or plan with, and as the servants and agents of, the Secret Service people on the ground, and of their superiors, Mr. Grimes and Mr. Rowley, of the Secret Service.

(m) For over five hundred pages of the record the United States Attorney and the Assistant Attorney General who participated in the trial tried to maintain the position that the Secret Service was not involved in the woes of the plaintiffs, but Mr. Grimes quite frankly put that issue to rest in his forthright, though incomplete, testimony on the subject. The court finds that the persons identified by the various witnesses with reference to their red, yellow and blue buttons or their walkie-talkie radios or receiving gear or "suits" were Secret Service agents or persons doing the bidding or carrying out their instructions and plans and were servants of the Secret Service.

(n) Ernie Helms, although not apparantly on the payroll nor under a commission or appointment of the Secret Service *per se*, was carrying out his duties as ticket-taker, appraisor of admission tickets and chief bouncer pursuant to instructions from the Secret Service and following a plan of action and criteria of exclusion previously established by the Secret Service (perhaps in conjunction with or under orders from other persons serving the Executive Department and acting for the Executive Department).

(o) The court does not rule out the possibility, suggested by the testimony, that the criteria for exclusion and the decisions to exclude may have been made in the first instance by unknown and undisclosed agencies or persons of the executive branch other than the Secret Service. A trial of the suit on the merits with disclosure of all pertinent information may answer that question. It does not affect the immediate problem as between the plaintiffs on the one hand and the Secret Service defendants on the other, because the Secret Service on this testimony laid down for local police and bouncers the criteria for exclusion, and Ernie Helms and his associates, aided by local police, carried out the evictions in line with those criteria; and it will not exempt the Secret Service people from whatever liability they may have if it be shown that others—lawfully or unlawfully—also participated.

3. *Suppression of Dissent Was The Standard For Exclusion From The Coliseum.*

(p) The criteria for exclusion of persons from the Coliseum, though not expressly stated, were executed by the Secret Service (R. 543, 548). It takes no imagination to determine those criteria. They are readily inferred from a description of the persons who were in fact ex-

cluded; they were persons fitting some or all of the following descriptions:

(1) People advocating peace in Vietnam;

(2) People opposing the Administration;

(3) People known or suspected of membership in the Red Hornets or any other activist organization interested in peace;

(4) People bearing signs or banners uncomplimentary to the President;

(5) People who chanted songs uncomplimentary to the President;

(6) Long-haired people, mostly young;

(7) People distributing pamphlets;

(8) People holding pamphlets that had been handed them by others;

(9) People opposing close affiliation of church and state;

(10) People who asked questions;

(11) People known to be connected with Marvin Sparrow and his wife;

(12) People suspected of affiliation with or sympathy with any of the above categories, or suspected of fitting any of the above descriptions.

(q) The overall compelling inference from this evidence is that the things done to the plaintiffs and others were directed towards the suppression of dissent or prevention of any expression or demonstration of dissent, from reigning points of view. No other inference explains the things that were done.

4. *The Charlotte Police Aided In Those Exclusions.*

(r) As to the Charlotte police, their principal independent action appears to have been the arrest outside the Coliseum of the plaintiffs McMahan, Miller and Binner. These arrests did not produce convictions of any crime. The evidence as to those arrests gives rise to factual questions whether the arrests and prosecutions were lawful or not.

(s) The rest of the actions of the police appear to have been expressly directed either by the Secret Service (such as the exclusion of people who had already been seated before Secret Service agents decided that they ought to be removed from the hall), or by Ernie Helms who, several times, called on police to evict persons with "counterfeit" tickets or who asked too many questions. Two persons, Tommy Lee Buckner (R. 254 *et seq.*) and John Jenkins (R. 341–362) were arrested by police without any knowledge on their part of alleged criminal conduct but simply upon the bidding of Ernie Helms, who told the police to arrest these people on specific misdemeanor charges. The actions of the police were in furtherance of a common design or plan or scheme with the Secret Service, and under direction and supervision of the Secret Service.

5. *Constitutional Rights Were Violated In Wholesale Fashion.*

(t) The evidence indicates that the various defendants, federal and state, violated the constitutional rights of various plaintiffs in at least the following particulars:

(1) Deprivation of free speech and expression;

(2) Denial of freedom of assembly;

(3) Denial of the right to petition for redress of grievances;

(4) Unlawful arrest;

(5) Denial of due process and Fourth Amendment rights by arrests without warrants for unwitnessed misdemeanors;

(6) Unlawful assault and battery under color of law.

(u) The various defendants thus participated in a wholesale assault upon the civil rights and liberties of numerous citizens, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

### III.

### CONCLUSIONS OF LAW

1. *Jurisdiction.*—The court has jurisdiction of the actions under 28 U.S.C. §

1331; 28 U.S.C. § 1343(3) and (4); and 42 U.S.C. § 1983.

■ 2. *Class Action.*—The plaintiffs are members of a class of United States citizens who were on October 15, 1971, or may in the future, in Charlotte or other places, be arbitrarily excluded from the general presence of the President of the United States at public gatherings because they dress or wear their hair differently from other people or because they exercise their constitutional rights to freedom of speech, press and religion, to peaceable assembly, to petition for redress of grievances, and to be secure from unreasonable searches or seizures without probable cause or without prior judicial approval—or are suspected of belonging to some of these categories or sympathetic with persons in such categories. The requisites of a class action are present. The class is so numerous that joinder of all members is impractical. Questions of law and fact common to the members of the class are numerous. The representative plaintiffs will fairly and adequately protect the interests of the class. The parties defendant have acted on grounds generally applicable to the class and injunctive relief is appropriate to the class as a whole.

■ 3. *Constitutional Violations.*— The various defendants, pursuant to a common plan or design and under the immediate control and supervision of the Secret Service defendants, systematically, arbitrarily and discriminatorily and without pretense of due process of law, committed wholesale assaults, exclusions, embarrassments, slanders, and deprivations of free speech, of right to freedom of assembly and right to petition for redress of grievances and other such transgressions upon plaintiffs and others without legal or other cause or excuse, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States as shown by the testimony and as specifically found herein.

4. *The essential purpose of these actions was suppression of dissent in any form.*

■ 5. *Presidential safety does not justify defendants' actions.*—The actions of the defendants are not justified upon the basis that they were necessary for presidential safety or security. There is an utter lack of evidence to support that theory, and the overwhelming weight of all the evidence is contrary. The actions of the defendants, although done as federal agents and ostensibly under color of federal authority, do not fit within the outer borders of their statutory authority, 18 U.S.C. § 3056, "to protect the person of the President . . . ." Protection of the President as a justification for what the defendants did has not even been presented for determination, and should not be an issue in the case unless evidence is offered to support it. No evidence suggests that any plaintiff or anyone else was a threat to the safety of the President on Billy Graham Day.

The attorneys for the federal defendants asked the court to assume, without proof, that since the President was in town everything done by the Secret Service was within the outer limits of what was necessary to protect the person of the President and, further, that none of the federal defendants should even be retained as defendants to explain their actions which, barring a valid security reason, constitute egregious violations of civil rights and liberties.

Such an assumption can not be made.

The authority and duty of the judiciary to inquire into deprivations of common right by government agents (even, in Lord Coke's phrase, upon authority of "letters of the King") can not be so cavalierly dismissed.

Rather than arrogantly claiming freedom from inquiry and accountability, those who wield force in our land should be eager to demonstrate the propriety of their actions. Secrecy in government breeds tyranny. Refusal to account to

oppressed citizens for their actions is not a hallmark of democracy or freedom.

■ 6. *Unless the defendants have better excuse for their actions than has been suggested on this record, they should be enjoined from doing this sort of thing again.*—If in fact the actions of the Secret Service and their agents were taken in good faith and in a belief reasonable under the circumstances that these actions were necessary for presidential security, I do not see where they would have any liability to any injured citizen, Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339 (2nd Cir. 1972).

The existence of their good faith, the absence of an illegal motive (such as suppression of dissent) and the reasonableness of the belief of the Secret Service and other law enforcement officials are questions of fact rather than occasions for exercise of executive privilege. They are the sorts of things which courts are created to inquire into, regardless of whether the law officials are Secret Service, local police, sheriffs or jailers, or narcotics agents.

". . . The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence. See H.R.Rep.No. 652, 64th Cong., 1st Sess. (1916). Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969). [Directing dismissal of criminal prosecution charging appellant with violation of a statute prohibiting threats against the life of the President.]

See, also, the concurring opinion of Justice Douglas which concludes (394 U.S. 705, 712, 89 S.Ct. 1399, 1403, 22 L.Ed.2d 664):

"Suppression of speech as an effective police measure is an old, old device, outlawed by our Constitution."

If evidence is introduced to show that the actions of the defendants were necessary to protect the security of the President, that evidence will certainly be fully considered. Lacking such evidence, I must adjudicate the equities on the basis of the facts as they are shown by the testimony of the witnesses rather than upon legalistic arguments about executive privilege.

These issues, though new to this court, are not new at all. Few questions involving fundamental human liberty are new; they just crop out in different factual situations. Quaker Action Group v. Hickel et al., 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969) dealt with a prior restraint on public gatherings in Lafayette Park and on Pennsylvania Avenue opposite the White House. In a most perceptive opinion, Chief Judge Bazelon held that somebody on behalf of the government had to come to court and explain why the restrictions in question were in fact necessary for presidential safety. Some of Judge Bazelon's remarks are timely and pertinent:

". . . [T]he Government has injected an additional, and most important, element into the case by arguing that large demonstrations threaten the safety of the President. This, of course, is a paramount interest underscored in importance by the tragic assassinations in recent years. But we cannot agree with the Government's argument that mere mention of the President's safety must be allowed to trump any First Amendment issue. While courts must listen with the utmost respect to the conclusions of those entrusted with responsibility for safeguarding the President, we must also assure ourselves that those conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat.

"The Government suggests that the importance and delicacy of any decision affecting the President's safety requires this court to limit its review to a determination whether the decision was 'wholly irrational.' We do not agree. The expertise of those entrusted with the protection of the President does not qualify them to resolve First Amendment issues, the traditional province of the judiciary. A balancing of First Amendment freedoms against the requirements of Presidential safety may be left to other agencies in the first instance. But absent a compelling showing—which has not been begun here—that courts cannot evaluate the questions of fact involved in estimating danger to the President, the final judgment must rest with the courts. To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision.

\* \* \* \* \* \*

"We do not suggest that the Government may not be able to show at trial that large demonstrations may threaten the safety of the Chief Executive. But we do hold that the Government must in fact show such a danger rather than simply advance its conclusion as a determination binding upon the courts. In the context of a preliminary injunction, the burden upon the Government may be lighter, but does not disappear. There has been no effort here to justify the Government's argument beyond the flat words of the Secret Service director. First Amendment rights are too precious for sacrifice upon such an unsupported altar." 421 F.2d 1111, 1117–1118 (1969).

On a later appeal [Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 460 F.2d 854 (1971)], the Court stuck by its original fundamental position and ordered the District Court to try the case on the merits rather than upon summary affidavits from Secret Service defendants. Judge Leventhal in this decision again reiterated the fundamental necessity for an honest inquiry into the truth rather than reliance upon the shibboleth of executive privilege or claim of presidential danger. The court quoted the pertinent language from the original opinion, rejected a claim that administrative remedies had to be exhausted, and held that the issue should be decided in court "through a hearing at which the assertions of pertinent Government officials may be subjected to the testing of cross-examination," 460 F.2d 854, 863, and that:

"We reiterate the requirement that the Government must apply to the court for an appropriate order before individuals and groups can be prohibited from participation in such demonstrations. Pending final determination of this case on the merits, that remains for judicial determination and not the *ipse dixit* of an executive official."

Scherer v. Brennan, 379 F.2d 609 (7th Cir. 1967), cert. den. 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 666, is relied on by the defendants. That decision quite correctly held Secret Service agents not liable for damages for trespass and temporary interference with plaintiff's right to free access to his Illinois home. His home was three hundred yards ("an easy rifle shot for any military model firearm") from O'Hare Inn, where the President was visiting; in his home he had military rifles and ammunition and a 25 mm. cannon capable of penetrating a concrete wall. That case hardly seems controlling here.

## IV.

### ORDER

It is, therefore, ordered:

1. Defendants, pending further order of court, are enjoined from discriminatorily arresting or detaining, or keeping from the general public presence of the President of the United States, plaintiffs and others similarly situated, on

account of their mode of dress or hairstyle, life style, peaceable expression of political (including dissenting) views, exercise of constitutional rights of free speech, petition for redress of grievances or right of association, without prior judicial authorization or without probable cause, or for any other cause not rationally necessary for the personal safety of the President.

2. Plaintiffs' third amended complaint is allowed to be filed.

3. The motions of the federal defendants for summary judgment and for dismissal are denied.

4. The case will stand for trial on the damages claims.