**Marjorie GLASSON,**
**Plaintiff-Appellant,**

v.

**CITY OF LOUISVILLE et al.,**
**Defendants-Appellees.**

**No 73–1509.**

United States Court of Appeals,
Sixth Circuit.

June 13, 1975.

Certiorari Denied Nov. 3, 1975.
See 96 S.Ct. 280

Thomas L. Hogan, Phillip Grauman, Louisville, Ky., for plaintiff-appellant.

James E. Thornberry, Herbert Van Arsdale, II, Frank A. Logan, Asst. Director of Law, City of Louisville, Louisville, Ky., for defendants-appellees.

Before PHILLIPS, Chief Judge, McCREE, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McCREE, Circuit Judge.

On July 14, 1970, in Louisville, Kentucky, a police officer forcibly took a poster from a young woman peacefully standing on a public sidewalk and destroyed it. Although not every encounter between a citizen and a policeman warrants extended judicial scrutiny and review, the implications of this apparently inconsequential incident raise important questions about the constitutional guaranty of freedom of expression, and require us to determine the circumstances in which police officers may be required to respond in damages in an action brought under the Civil Rights Acts, 42 U.S.C. §§ 1983, 1985(3), for abridgement of rights guaranteed by the First and Fourteenth Amendments.[1]

The district court, sitting without a jury, determined, after trial, that appellant could not recover damages under section 1983 because the police had acted reasonably in destroying her poster and that she could not recover damages under section 1985(3) because she had failed to prove that the destruction of her poster was motivated by an impermissible discriminatory animus. We reverse.

On July 14, 1970, the former President of the United States, Richard M. Nixon, was scheduled to ride in a motorcade in Louisville, Kentucky, before attending the Appalachian Governors' Conference. In anticipation of this procession, appellant Glasson, a young Caucasian woman, had prepared to display to the President a poster on which she had printed, "Lead us to hate and kill poverty, disease and ignorance, not each other." By display-

ing this poster, she hoped to express to the President and to anyone else who might read it, her concern about the divisive issues of American racism and the Vietnam War, and her wish that the President would channel the energies of his administration to heal the divisions created by these issues, and to eliminate poverty, disease, and ignorance. These problems were on the agenda of the Governors' Conference.

Early that morning, Louisville police officers to whom had been assigned the duty of safeguarding the President during the motorcade by monitoring the crowd and keeping it orderly, were given their general orders of the day by Lt. Colonel Edgar Mulligan, Assistant Chief of Police of Louisville. Appellee Colonel Hyde, the Chief of Police, was also present. Appellees Johnson and Medley, police officers with approximately 25 years of experience, attended the meeting and were instructed to destroy any sign or poster that was "detrimental" or "injurious" to the President of the United States.

Both Johnson and Medley had previously received instruction in crowd control methods and in handling demonstrations and protests against important public officials. According to Chief of Police Hyde, "we always planned in generalities to use whatever force was necessary [to preserve peace] and have faith in the people . . . assigned out there to exercise their best judgment based upon their training . . . that [they] heretofore had had regarding crowd control." Individuals were to be permitted to demonstrate peacefully "[a]s long as they didn't incite others that might cause trouble . . .." Should other persons be incited or provoked by a sign, police officers were directed to take whatever action was necessary, including the use of force to maintain or restore order.

---

1. In the brief that appellant submitted to this court she conceded that she had no claim against the City of Louisville and stated that she did not wish to pursue her claims against Frank W. Burke and George Burton.

It is undisputed that on the day in question, appellant Glasson was standing peacefully against a building holding her sign as she awaited the motorcade. Several other persons were also displaying signs and posters, all of which bore salutations like "Welcome to the President." According to Johnson and Medley, a group of persons located across the street from Glasson noticed her poster and were provoked by it into grumbling and muttering threats. Officer Medley testified that this group was "hollering" and that his attention was drawn by this boisterous conduct to appellant's poster on which, he testified, was printed in large letters "Murderer, teach us to hate and kill" and then in smaller letters "Poverty, ignorance and so forth", a message that he determined was detrimental to the President.[2] He then conferred with Officer Johnson and informed him that the poster was "pretty bad because the crowd across the street is going to go over and get her—maybe hurt her." Officer Johnson agreed that the poster was detrimental to the President and directed Medley to follow the general orders given that day—to destroy all signs detrimental to the President. Officer Medley then approached appellant and, according to his testimony, asked her "Would you please take this sign down Lady; it's detrimental to the United States of America." When Miss Glasson refused, and replied that she had a right to display it, Medley took it from her and tore it up. The hecklers across the street cheered and then immediately quieted down and began to disperse.

At trial, Johnson and Medley testified that the boisterous group that had spurred them into action consisted of twenty-five to thirty persons and that there were approximately seven to twelve police officers stationed on the block where the demonstrators stood. When asked whether the police force at hand was sufficient to handle a possible disorder in a crowd that size, Officer Johnson responded that the answer depended upon the number of people who became involved, but that "if it got so bad that we had to have reinforcements we could have done that also." Moreover, even though Johnson testified that the disturbance "was reaching the stage of a riot," the record shows that not one heckler crossed, or even attempted to cross the street, no reinforcements were ever summoned, and the secret service, the federal agency assigned the duty of safeguarding the President, 18 U.S.C. § 3056, was not alerted. Neither officer told the crowd to quiet down or attempted to calm its members except to assure them that the police would take care of appellant's poster. When Officer Medley was asked what he would have done had members of the boisterous group begun to cross the street, he replied, and Johnson agreed, that no crime would have been committed had they crossed the street and taken appellant's poster because it was "inflammatory anyway." A permissible sign, according to Medley, was "[a]ny sign welcoming the President," and, he observed, that he saw "no other signs with . . . derogatory remarks about the President . . .." When Johnson was asked, "If there were a group of school children holding a sign saying Welcome, President Nixon, and twenty-five or thirty people across the street were booing them and saying that they didn't like President Nixon and they were going over to get that sign, would you take that sign away from those school children, he replied, "No." He qualified this answer later in his testimony when he stated that he would not have taken it unless "trouble engulfed or started or was created."

Appellant and a law professor who was standing across the street from her near the crowd, both testified that they heard no boisterous heckling but that, on the contrary, because the motorcade had been delayed, the crowd had become sub-

---

2. The district court made no finding that the poster contained the epithet, "Murderer," even though Officers Medley and Johnson testified that it did and Miss Glasson testified that it did not.

dued and bored at the time Medley grabbed the poster. They also testified that the reaction of the crowd to the police officer's action against appellant was mixed—some persons applauded and cheered while other persons booed and hissed.

Miss Glasson testified that this was the first time that she had ever engaged in a political demonstration; that she was shocked and frightened by Officer Medley's conduct; and that since that time she has been fearful of participating in any other demonstrations.

As a result of this encounter, she filed this action in the United States District Court for the Western District of Kentucky under sections 1983 and 1985(3) of the Civil Rights Acts, 42 U.S.C. §§ 1983, 1985(3). Her complaint charged that Officers Johnson and Medley, acting under color of law, deprived her of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and that they, acting with appellee Hyde, conspired to deprive her of the equal protection of the laws and of equal privileges and immunities under the laws of the United States. She requested compensatory and punitive damages.

The district court, after trial without a jury, made the following findings of fact: (1) that before the President's motorcade had arrived, a group of persons became angered by the message on appellant's poster and began "pointing and calling across the street . . . ."; (2) that Officers Johnson and Medley determined "that the message was inflammatory and [that] it was creating rancor and resentment in the crowd which could impede the progress of the motorcade and jeopardize the safety of the President, other members of the motorcade and the onlookers in the crowd;" and (3) that Officer Medley asked appellant to take her poster down and then took it away from her and destroyed it when she refused to comply with his request. The district court determined, as a matter of law, that Officers Medley and Johnson had not violated section 1983 of

the Civil Rights Acts because they "acted in good faith and upon reasonable grounds, and their decision and action in removing the sign from the plaintiff and destroying it were within the ambit of permissible discretion as it appeared at the time," citing *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and *Notaras v. Ramon,* 383 F.2d 403 (9th Cir. 1967). It also concluded, citing *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), that none of the three appellees had violated section 1985(3) of the Civil Rights Act because there was "no evidence" that their action was motivated by a " 'class-based invidious discriminatory animus.' "

■ On appeal it is contended that the district court erred in holding that the officers acted reasonably and in good faith in seizing and destroying appellant's poster, and in determining that there was no evidence of an impermissible invidious discriminatory animus. We agree and reverse. Although generally findings of fact by a trial court must be accepted by an appellate court unless they are clearly erroneous, F.R.Civ.P. 52(a), determinations, whether called ultimate findings or conclusions of law, that attach legal significance to historical facts may be reversed if upon examination of the record they are found to be erroneous. *E. g., United States v. Weingarden,* 473 F.2d 454, 460 (6th Cir. 1973), *Guzick v. Drebus,* 431 F.2d 594, 599 (6th Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971), *Ashland Oil & Refining Co. v. Kenny Construction Co.,* 395 F.2d 683, 684 (6th Cir. 1968), *Cordovan Associates, Inc. v. Dayton Rubber Co.,* 290 F.2d 858, 859 (6th Cir. 1961). *See Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). We hold that when Officer Medley destroyed Miss Glasson's poster, she was engaged in activity protected by the First and Fourteenth Amendments; that his action, directed by Officer Johnson and authorized by Chief of Police Hyde, was unreasonable and not taken in good faith; and that it violated her constitutional rights and

was actionable under section 1983 of the Civil Rights Acts. Moreover, since appellees agreed to destroy all placards that were critical of the President and offensive to the community, the destruction of the poster was pursuant to an impermissibly invidious discrimination remediable under section 1985(3) of the Civil Rights Acts.

■ No state may agreeably to the Constitution intercept a message and remove it from the channels of communication or punish its dissemination solely because of its content unless it is obscene, *e. g., Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), defamatory, *e. g., New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), constitutes "fighting words," *e. g., Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), or substantially and directly imperils national security, *see New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Moreover, the Constitution protects not only the substance of an expression but also the use of words selected for their emotive quality even though they may offend the tastes of the community. *E. g., Papish v. Board of Curators of the University of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), *Thonen v. Jenkins,* 491 F.2d 722 (4th Cir. 1973). Inherent in suppressing the use of particular words is the grave risk of inhibiting the expression of ideas, particularly unpopular ones.

The message that Miss Glasson sought to communicate was an expression of her views about important public questions and policies. This kind of expression is entitled to the greatest constitutional protection. As the Supreme Court stated in *New York Times Co. v. Sullivan, supra,* 376 U.S. at 269, 84 S.Ct. at 720:

The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

Accordingly, even if the appellation "Murderer" appeared on Miss Glasson's placard, and her message was expressly critical of the Nixon administration, it was constitutionally protected. The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is "the central meaning of the First Amendment." 376 U.S. at 273, 84 S.Ct. at 722. *See generally A. Meiklejohn, Political Freedom: The Constitutional Powers of the People* (1948), Kalven, *The New York Times Case: A note on "The Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191.

■ Although the content of a communication may be protected, the state may, in some circumstances, regulate the time, place and manner of expressing it. *See, e. g., Grayned v. City of Rockford,* 408 U.S. 104, 115–17, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). For example, it may determine not to permit two parades to proceed along the same street at the same time, or two rallies to be held simultaneously in the same part of a public park. Moreover, the state may in appropriate circumstances prohibit rallies in jail yards, *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), in public libraries, *see Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), and near courthouses, *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). *See generally* Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 Sup.Ct. Rev. 1. Yet, at the same time, our public streets and parks

have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes

of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

In this case, Miss Glasson was in a place where she had a right to be, at a time that was appropriate, and was conducting herself peacefully and lawfully. She, like many other persons, had taken the opportunity to express her ideas to the President—from a place designated by the state for onlookers and in a manner often used by persons who do not have access to the print or broadcast media.

■■■ Moreover, we do not believe that Miss Glasson somehow forfeited the protection afforded her message by the Constitution because it unintentionally evoked a hostile reaction from others. We reach this conclusion after considering this case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721. The purpose of the First Amendment is to encourage discussion, and it is intended to protect the expression of unpopular as well as popular ideas. Accordingly, hostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker's message so long as the speaker does not go beyond mere persuasion and advocacy of ideas and attempts to incite to riot. *See, e. g., Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Ashton v. Kentucky,* 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); *Edwards v. South Carolina, supra; Feiner v. New York,* 340 U.S. 315, 321, 71 S.Ct. 303, 95 L.Ed. 295 (1951).[3]

To permit police officers to prohibit the expression of ideas which they believe to be "detrimental" or "injurious" to the President of the United States or to punish for incitement or breach of the peace the peaceful communication of such messages because other persons are provoked and seek to take violent action against the speaker would subvert the First Amendment, and would incorporate into that constitutional guarantee a "heckler's veto"[4] which would empower

---

**3.** Feiner used a loudspeaker to address an interracial crowd of seventy-five to eighty persons and urged them to attend a meeting to discuss racial discrimination. During the course of his exhortation, he made derogatory remarks about President Truman, the Marshall Plan, and local officials, and urged the Negroes in the crowd to "rise up in arms" against white people and "fight for equal rights." The crowd blocked sidewalks, forcing pedestrians to walk in the street, and became angry and threatened to attack Feiner if the police failed to act. The police requested Feiner to stop speaking three times before arresting him for disorderly conduct. In upholding the conviction, the Supreme Court determined that the police "in making the arrest were motivated

solely by a proper concern for the preservation of order and protection of the general welfare, and that there was no evidence which could lend color to a claim that the acts of the police were a cover for suppression of petitioner's views and opinions." 340 U.S. at 319, 71 S.Ct. at 306.

For over twenty years the Supreme Court has confined the rule in *Feiner* to a situation where the speaker in urging his opinion upon an audience intends to incite it to take action that the state has a right to prevent.

**4.** For a discussion of the concept of a "heckler's veto," *see generally* H. Kalven, The Negro and the First Amendment 140–60 (1966).

an audience to cut off the expression of a speaker with whom it disagreed. The state may not rely on community hostility and threats of violence to justify censorship.

The record before us demonstrates that Miss Glasson, in displaying her placard which contained a constitutionally protected message, in a peaceful manner, from an appropriate place, was engaged in activity protected by the First Amendment and that the destruction of the sign by Louisville police officers Johnson and Medley deprived her of that right. She thus made out a prima facie case for damages under section 1983. This section of the Civil Rights Act provides, in relevant part:

> Every person who, under color of any statute, regulation, custom or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

This statute imposes on the states and their agents certain obligations and responsibilities. A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect from violence persons exercising their constitutional rights. *E. g., Sellers v. Johnson,* 163 F.2d 877 (8th Cir. 1947), *Cottonreader v. Johnson,* 252 F.Supp. 492 (M.D.Ala.1966). And, in the absence of a speaker's exhortation to violence, in carefully defined circumstances, "state officials are not entitled to rely on community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights." *Smith v. Ross,* 482 F.2d 33, 37 (6th Cir. 1973). *Accord, e. g., Gregory v. Chicago,* 394 U.S. 111, 119, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring) and cases cited therein.[5]

---

5. In *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), for example a speaker, whose ideas had caused a violent reaction from some members of his audience, was convicted of violating an ordinance that prohibited any activity that " 'stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " *Id.* at 3. In reversing the conviction, the Court observed that " . . . a function of free speech under our system of government is to invite dispute. It may indeed serve its highest purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.* at 4.

In view of this high purpose of the First Amendment, the Supreme Court has become increasingly reluctant to affirm convictions of speakers for disorderly conduct or breach of the peace when their expression of ideas protected by the First Amendment has unintentionally provoked reaction from a hostile crowd. *E. g., Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Gregory v. Chicago, supra; Cox v. Louisiana,* 379 U.S. 536, 559, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina, supra; Niemotko v. Maryland,* 340 U.S. 268, 273–89, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (Frankfurter, J. concurring); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

In *Street,* the Supreme Court, in reversing a conviction for burning an American flag and for publicly speaking contemptuous words about it, stated:

> Nor could such a conviction be justified on the second ground mentioned above: the possible tendency of appellant's words to provoke violent retaliation. Though it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of "fighting words" which are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942).

. . .

> Again, such a conviction could not be sustained on the ground that appellant's words were likely to shock passers-by. Except perhaps for appellant's incidental use of the word "damn," upon which no emphasis was placed at trial, any shock effect of appellant's speech must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. [Citations omitted].

394 U.S. at 592, 89 S.Ct. at 1366.

The duty of police officers to protect persons exercising the constitutional right of expression is illustrated by the case of *Cottonreader v. Johnson, supra.* In that case, the court, on behalf of demonstrators for racial equality, issued an injunction that ordered police officers to protect them from violent actions threatened by persons opposed to their cause. In explaining the basis for its order, the court observed that the police officers had stood by idly while hostile whites attacked the demonstrators and that they had engaged in acts of brutality themselves. It determined that the police officers had failed to discharge the duties the law imposed on them by "failing to maintain and keep order, generally, when these marches and protests were taking place," and it rejected "the claim that they did not have an adequate police force to cope with such situations" when this claim was "made without any effort on the part of the defendants to seek and obtain assistance from other authorities." 252 F.Supp. at 496. The court concluded that

> [u]nder such circumstances suppression by public officials or police of the rights of free speech and assembly cannot be made an easy substitute for the performance of their duty to maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or demonstrators in the exercise of their rights against violent or disorderly retaliation or attack at the hands of those who may disagree and object.

*Id.* at 497.

If this were a case requiring us to review a criminal conviction of Miss Glasson for displaying her sign or to review the denial of an injunction prohibiting appellees from engaging in activity like that challenged here (assuming that the other prerequisites for injunctive relief were satisfied), our inquiry would be ended. *See, e. g., Gregory v. Chicago, supra.* In this appeal, however, we review not a criminal conviction nor a denial of injunctive relief, but a civil action for damages based upon state deprivation of constitutional rights by means short of an arrest.

In determining the circumstances under which a police officer must respond in damages for the tortious interference with a person's right to express ideas, we do not write upon a blank slate. In *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court announced that reasonableness and good faith was an affirmative defense to an action brought under 42 U.S.C. § 1983. The Court recognized that police officers acting in good faith should be accorded an area of discretion when their actions are the subject of a suit for damages for unlawful or wrongful conduct ostensibly within the scope of their duties. And, when a police officer is accused of false arrest, "good faith and probable cause" affords a defense to a section 1983 action brought against him. *Id.* at 557, 87 S.Ct. 1213. *See also Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

This affirmative defense was recently reconsidered by the Supreme Court in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), an action brought by high school students who claimed that they had been suspended from school in violation of their constitutional rights and sought appropriate damages. In its discussion of the affirmative defense available to the school board members who had ordered the suspension, the Court stated:

> The official must himself be acting sincerely and with a belief that he is doing right but *an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law* on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of

supervising the operation of the school and the activities of the students, must be held to *a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges.* Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. (Emphasis supplied).

*Id.* at 321, 95 S.Ct. at 1000.

■ Although only *Pierson* specifically concerns the liability of police officers for invasion of constitutional rights, both *Scheuer v. Rhodes* and *Wood v. Strickland* are helpful in determining the conditions under which an affirmative defense of reasonableness and good faith has been established. From an examination of all three cases, we conclude that the factors to be considered in determining whether the defense has been established are whether the police officers knew or should have known that the complainant was engaged in the exercise of constitutionally protected activity, and if they knew (or should have known), whether they acted out of an honest and reasonable belief that their interference with the exercise of those rights was required to avoid imminent and serious injury to persons or property. Every asserted justification must be considered carefully on a case by case basis, and due

regard must be given to the fact that the officers may be acting in the urgency of a street confrontation and not in the contemplative atmosphere of judicial chambers.

These factors, in one form or another, have been considered by federal courts for a number of years in cases in which police officers who suppressed the peaceful expression of ideas have been asked to respond in damages to the speaker. In *Downie v. Powers,* 193 F.2d 760 (10th Cir. 1951), a group of Jehovah's Witnesses were attacked by a mob, and police officers, although aware of threats of violence, did nothing to prevent the formation of the mob or to restore order after violence broke out. In holding that because of a procedural error the members of this sect were entitled to a new trial of their action against the officers for damages brought under section 1983, the court stated:

One charged with the duty of keeping the peace cannot be an innocent bystander where the constitutionally protected rights of persons are being invaded. He must stand on the side of law and order or be counted among the mob. [Citations omitted]. But the officials are the keepers, not the insurers of the peace in the community. Diligent and conscientious effort is all that is required. Otherwise, officers would be civilly and criminally liable under Federal law for every breach of a constitutionally protected right of a citizen—a result which the framers of the Civil Rights Act never intended.

*Id.* at 764.

Other courts have recognized a defense of reasonableness and good faith to actions brought for damages under section 1983 even when the justification asserted for the challenged police behavior was security of the President. *E. g., Scherer v. Brennan,* 379 F.2d 609 (7th Cir.), *cert. denied,* 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 666 (1967); *Butler v. United States,* 365 F.Supp. 1035 (D.Haw. 1973); *Sparrow v. Goodman,* 361 F.Supp. 566 (W.D.N.C.1973), *aff'd sub nom. Rowley v. McMillan,* 502 F.2d 1326 (4th

Cir. 1974). In *Scherer* the court affirmed a determination that Secret Service agents were not required to respond in damages for trespass and for interfering with a plaintiff's use of his home, when the home, in which he kept military rifles, rounds of ammunition, and cannon, capable of penetrating a concrete wall was located within three hundred yards of an inn where the President was staying. Although this case was decided before the Supreme Court decision in *Pierson,* the court took into account the fact that plaintiff had previously been arrested for illegal possession of a dangerous weapon, a cannon, and that the agents' action was reasonably related to their statutory duty of protecting the President. The facts of that case are, of course, a far cry from those before us in which there is no suggestion that Miss Glasson herself posed any threat to the safety of the President.

In *Butler, supra,* the court refused to grant defendants' motion to dismiss or for summary judgment in an action for damages brought under section 1983 against military security personnel. Plaintiffs had been excluded from a public reception for the President, and were detained for fingerprinting, photographing and other purposes because they wished to express peacefully their opposition to the President's policies and to his reelection. In ordering the case to be tried, the court observed, and we agree, that "[w]here the occasion for exercising First Amendment rights has passed, a private action for damages affords the only practicable means of redressing the wrong alleged." *Id.* at 1040. "But," the court stated, "a law enforcement officer may allege and prove in defense his subjective good faith belief that his conduct was lawful and the objective reasonableness of this belief under the circumstances." *Id.* at 1045.

Finally, in *Sparrow v. Goodman, supra,* plaintiffs, who were excluded from a public gathering at which the President appeared, brought an action for injunctive relief and for damages for false arrest and assault under section 1983. The court ordered the case for damages to be set for trial and observed that the evidence adduced at the hearing in connection with the issuance of an injunction indicated that plaintiffs had been excluded solely because they had opposed, or because their appearance had suggested that they opposed, the President. The court determined that the reason for exclusion was plaintiffs' political beliefs, and that there was no evidence to suggest that plaintiffs presented a threat to the President's safety. Moreover, in rejecting the asserted justification of presidential security, the court stated that it was unwilling to assume, without proof, that the asserted justification was valid. 361 F.Supp. at 586.

Ideally, police officers will always protect to the extent of their ability the rights of persons to engage in First Amendment activity. Yet, the law does not expect or require them to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection without having to respond in damages. Accordingly, whether a police officer must respond in damages for his actions is judged by whether his conduct was reasonable, considering all the circumstances, and by whether he acted in good faith. A police officer's stated good faith belief in the necessity or wisdom of his action is not dispositive of that element of the defense, but must be supported by objective evidence. *See, e. g., Pierson v. Ray, supra; Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Scott v. Vandiver,* 476 F.2d 238 (4th Cir. 1973); *Rodriguez v. Jones,* 473 F.2d 599 (5th Cir. 1973); *Dowsey v. Wilkins,* 467 F.2d 1022 (5th Cir. 1972). To hold that a police officer is exonerated from liability if he merely acts in subjective good faith might foster ignorance of

the law or, at least, encourage feigned ignorance of the law. This we are unwilling to do. The law does not expect police officers to be sophisticated constitutional or criminal lawyers, but because they are charged with the responsibility of enforcing the law, it is not unreasonable to expect them to have some knowledge of it. We cannot permit a police officer to avoid liability for damages by pleading ignorance of the law when he unreasonably or in bad faith oversteps the bounds of his authority and invades the constitutional rights of others. At the same time, courts should not "second guess" police officers who are often required to assess a potentially dangerous situation and respond to it without studied reflection. Thus, even though a police officer may not have chosen the wisest or most reasonable course of action, he will not be civilly liable if his conduct is based on a reasonable and good faith belief that it was necessary under the circumstances. *See, e. g., Smith v. Ross,* 482 F.2d 33, 37 (6th Cir. 1973), where this court stated, in affirming the dismissal of a complaint in a section 1983 action after trial, "We do not condone the actions of the deputy, who would have served his office more honorably by unequivocally protecting appellants regardless of the local unpopularity his actions might have evoked."

In examining whether appellees Johnson and Medley acted in good faith and whether their asserted belief that their actions were necessary to protect the President was reasonable under the circumstances, it is "our duty . . . to make an independent examination of the whole record." *Edwards v. South Carolina,* 372 U.S. at 235, 83 S.Ct. at 683. There is no evidence that Miss Glasson's placard posed any threat to the safety of the President, to his motorcade, or to onlookers. If any danger to public order existed, it was posed by the persons who were offended by her message. Yet, these persons were located across the street from appellant, were only twenty-five to thirty in number, and never even stepped off the curb on their

side of the street in the direction of Miss Glasson. In addition, there were approximately eight to twelve police officers on duty in close proximity to this moderately sized crowd and, although Johnson testified that he was not sure whether this force would have been adequate to maintain order, he also testified that reinforcements could have been obtained rapidly had that been necessary. Although Officers Medley and Johnson characterized the hecklers as "near to riot", at no time did they admonish the crowd, call for reinforcements, or even alert the Secret Service despite the claimed danger to the President. Moreover, the disturbance did not attract the attention of any other police officers stationed nearby. These circumstances, taken together, demonstrate that their asserted belief that the destruction of appellant's poster was necessary to presidential security and to public order was not reasonable.

Our examination of the record also convinces us that the destruction of appellant's poster was not done in good faith. The general order of the day was to destroy all posters "detrimental" or "injurious" to the President. When Officer Medley first noticed Miss Glasson's poster he determined that it was detrimental to the President, a judgment in which Officer Johnson concurred before ordering its destruction. When Officer Medley took the poster from Miss Glasson he informed her that the reason for his action was that the poster was "detrimental to the United States," not that she, the President, or any other person was endangered by it. Both officers testified that only posters favorable to the President were permissible. Moreover, Officer Johnson unequivocally testified that had this same crowd under the same circumstances been outraged by a poster favorable to the President he would not have ordered its destruction. Although he later qualified his answer, his testimony still demonstrates that a different standard would have been applied had the crowd been provoked by a poster favorable to the President. The

actions of Officers Medley and Johnson were the result of an official determination not to permit dissent and of their failure to accord to appellant the right to engage in activity protected by the First Amendment. Also, they failed to recognize her right to be protected from criminal assault and battery. They testified that they had no obligation to protect appellant, and that had any member of the crowd proceeded against her they would not have arrested the aggressor because in their judgment appellant's poster was "inflammatory." The actions and attitudes of appellees Medley and Johnson thus bespeak a callous disregard of Miss Glasson's right to express and to advocate peacefully her ideas and exhibit shocking disregard of her right to have her person and property protected by the state from violence at the hands of persons in disagreement with her ideas. *Compare Gregory v. Chicago, supra.*

Accordingly, we hold that these police officers are required to respond in damages under section 1983 of the Civil Rights Act because they suppressed appellant's peaceful communication of ideas protected by the First Amendment. When other persons became hostile because of disagreement with the content of her communication, the police officers were not authorized to suppress the offending speech. They may not defend against a section 1983 action on the ground that her message "could impede the progress of the motorcade and jeopardize the safety of the President, other members of the motorcade and the onlookers in the crowd," when they made no attempt to calm the crowd whose unruliness was limited to muttering threats unaccompanied by action; when they admit that they, either alone or with available reinforcements, could have handled a potential disturbance; when they did not contact the Secret Service or call for reinforcements; and when they admit that had the same crowd been provoked by a poster favorable to the President, they would not have destroyed it.

We also determine, after a careful examination of the entire record, that Miss Glasson's poster was taken from her pursuant to a "class-based invidiously discriminatory animus," *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1972) and that, unless there exists some other basis for excusing appellees Hyde, Johnson and Medley, appellant proved a violation of section 1985(3) of the Civil Rights Act, 42 U.S.C. § 1985(3). Section 1985(3) provides in relevant part:

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The United States Supreme Court, in a recent interpretation of this statute, stated: "The language requiring intent to deprive a person of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise, class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge, supra* at 102, 91 S.Ct. at 1798. Although the Court, in that case, refused to decide whether discrimination based on a criterion other than race would be sufficient to establish a cause of action under the Act, its earlier decisions have suggested that this is so. *E. g., Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). Accordingly, this court, in construing the statute, has held that the statutory language does not require that the discrimination be based on race. *E. g., Cameron v. Brock,* 473 F.2d 608 (6th Cir. 1973); *Azar v. Conley,* 456 F.2d 1382 (6th Cir. 1972). *Accord, e. g., Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971). In the *Cameron* case, we affirmed a judgment for plaintiffs in an action brought by a supporter of an incumbent sheriff's opponent who was arrested while distributing campaign leaflets and who charged that his arrest was a part of a conspiracy to deprive him

and other supporters of the sheriff's opponent of the equal protection of the laws. In affirming, we held "that § 1985(3)'s protection reaches clearly defined classes, such as supporters of a political candidate. If a plaintiff can show that he was denied the protection of the law because of the class of which he was a member, he has an actionable claim under § 1985(3)." 473 F.2d at 610.

In the case before us, the district court found that the action of the police officers was not based upon an invidious criterion. Whether that conclusion is one of fact, or law, or mixed, makes no difference because we hold that the conclusion was not merely wrong but clearly erroneous. The record shows indisputably that the Louisville police officers established as a guideline for monitoring the crowd during the President's motorcade an invidious discrimination between persons displaying posters or signs critical of the President and those with posters or signs favorable to him. First, during the general orders on the morning of July 14, Chief of Police Hyde was present when Officers Medley and Johnson were instructed to destroy any sign "detrimental" or "injurious" to the President. When Officer Medley's attention was attracted to appellant's poster he determined that it was detrimental, and Johnson agreed, referring to the general orders of the day. Although there was some conversation between Johnson and Medley concerning the opposition of some members of the crowd to the poster, the record discloses that this consideration was only a minor factor in their decision to proceed against Miss Glasson. At the time of the unrest, it is undisputed that neither Johnson nor Medley did anything to calm the crowd except to express assurances that they would accede to and carry out its wishes. Moreover, when Officer Medley destroyed appellant's poster, his justification expressed to her was not that her personal safety or that of the President was endangered, but that her message was detrimental to the President or to the United States.

At trial, when Officer Medley was asked what kind of poster would have been permissible that day, he replied that only those that had "Welcome President Nixon" or similar messages would have been permitted. When Officer Johnson was asked whether he would have ordered the destruction of a poster favorable to the President, he answered, "No." Moreover, both officers testified that they had no obligation to protect Miss Glasson in the event the crowd assaulted her because her poster was "inflammatory."

The record is thus unmistakably clear that appellees intended to permit no criticism of the President that day. A more invidious classification than that between persons who support government officials and their policies and those who are critical of them is difficult to imagine. Appellees drew a line that was not merely invidious but one that also struck at the very heart of the protection afforded all persons by the First and Fourteenth Amendments. See *New York Times, Inc. v. Sullivan, supra.*

We hold that the district court erred in entering a judgment for appellees in the section 1983 action on the grounds that Officers Johnson and Medley acted reasonably and in good faith in destroying appellant's poster and in the section 1985(3) action on the ground that appellant had failed to prove that the destruction of her poster resulted from an invidiously discriminatory animus. Accordingly, we reverse and remand for further proceedings consistent with this opinion and for a determination of the damages Miss Glasson sustained. In so doing, we observe that appellant may recover not only for out-of-pocket expenses but also for emotional and mental distress. Donovan v. Reinbold, 433 F.2d 738 (9th Cir. 1970).

Reversed and remanded.