ROGERS, Circuit Judge,
dissenting.
Today’s holding provides a roadmap that effectively advises how to force the police to help disrupt a minority’s speech and assembly rights. It is as if we are advising as follows:
Yes, you can get the police to help you attack and disrupt something like a minority cultural identity fair, even if the police are not inclined to do so. Tell the police your plans ahead of time, and bring photographers. Get a determined group of disrupters and go in with the most offensive and incendiary chants, slogans, insults, and symbols — the more offensive the better. The object is to stir up some physical response. Then, when things get rough (your goal), insist that the police protect you, and (ironically) your First Amendment rights, by serving as a protective guard. The peace officers cannot at that point tell you to leave, even to avoid injury to you, because if the peace officers do that, they will have to pay you damages. Faced with the choice of allowing you to be an injured martyr (keep your cameras ready) or serving as a protective guard as the disruption escalates, the peace officers will doubtless choose the latter and become your phalanx. It’s a win-win situation for you, and a lose-lose situation for the minority group putting on the fair.
Only a formalistic application of First Amendment doctrines, from substantially different cases, could lead to a result so inconsistent with the core of the First Amendment. This is not a case where the Bible Believers faced punishment or liability for their speech. The only punishment threatened was a citation for refusing to move away from a physical altercation. That fact distinguishes this case from most of the cases that the Bible Believers rely upon.
To disruptive hecklers, the irony of using a “heckler’s veto” doctrine to empower them in their heckling must be sweet. As demonstrated below, the great cases that admirably condemn a “heckler’s veto” are profoundly different from this case. They involve criminal prosecution of speakers on the basis that the speech, itself, constituted a breach of the peace. In Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), for example, African-Americans gathered on the statehouse grounds and some 200 to 300 curious onlookers gathered. There was no traffic obstruction and nothing in the way of “threatening remarks, hostile gestures, or threatening language.” Id. at 231, 83 S.Ct. 680. Police ordered the protestors to disperse, and when they did not, the police arrested them and charged them with breaching the peace. Id. at 233, 83 S.Ct. 680. The Supreme Court overturned the protestors’ criminal convictions on the ground that the common-law crime of which the protestors had been convicted permitted punishment “upon evidence which showed no more than that the opinions which [the protesters] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police pro *275 tection.” Id. at 237, 83 S.Ct. 680. In overturning the protestors’ convictions, the Court noted (1) that “nobody among the crowd actually caused or threatened any trouble,” id. at 231, 83 S.Ct. 680, (2) that “[p]olice protection at the scene was at all times sufficient to meet any foreseeable possibility of disorder,” id. at 232-33, 83 S.Ct. 680, (3) that “[t]here was no violence or threat of violence on [the protesters’] part, or on the part of any member of the crowd watching them,” id. at 236, 83 S.Ct. 680, and (4) that “[p]olice protection was ‘ample,’ ” id. These facts, the Court explained,
[were] a far cry from the situation in Feiner v. New York, where two policemen were faced with a crowd which was “pushing, shoving and milling around,” where at least one member of the crowd “threatened violence if the police did not act,” where “the crowd was pressing closer around petitioner and the officer,” and where “the speaker passes the bounds of argument or persuasion and undertakes incitement to riot.”
Id. at 236, 83 S.Ct. 680 (quoting Feiner v. New York, 340 U.S. 315, 317-18, 321, 71 S.Ct. 303, 95 L.Ed. 295 (1951)). Nothing in Edwards is even close to the situation in this case. In Edwards there was no hint of an altercation or disruption.
The same distinction applies to Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), a landmark of the Civil Rights Movement of the 1960s. There, police arrested the speaker the day after a peaceful student protest in which the speaker advocated that his fellow protesters conduct sit-ins at certain local businesses. Id. at 542-44, 85 S.Ct. 453. The Supreme Court overturned the conviction for breaching the peace because the speaker had been punished “merely for peacefully expressing unpopular views.” Id. at 551, 85 S.Ct. 453. That, the Court once more clarified, was different from punishing a speaker for deliberately thwarting law enforcement’s legitimate efforts to pacify an altercation. Id. at 550-51, 85 S.Ct. 453 (distinguishing Feiner). The evidence alleged to indicate potential violence was limited to purported grumbling, muttering, and jeering from a group of 100 to 300 white people across the street. Id. In short, the Court held that the speaker could not be convicted of using words that disturbed the peace merely because his words might have led to an altercation. This is categorically different from holding that the police may not separate people who are involved in an altercation, and threaten a citation if one of the parties fails to separate.
Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), also involved the Court’s overturning the conviction of a speaker for breaching the peace, where the ordinance on which the conviction rested “permitted conviction of [the speaker] if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest.” Id. at 5, 69 S.Ct. 894. The decision addressed only whether the speaker could be convicted of a crime based on his speech’s tendency to cause unrest. The decision said nothing about what steps police could take to quell an altercation already underway — which is to say, it said nothing about the actions of the police in this case.
Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), involved a Jehovah’s Witness and his two sons who had gone door-to-door in a Catholic neighborhood distributing literature and requesting pedestrians’ permission to play a phonograph record critical of the Roman Catholic Church, which offended the pedestrians. The Supreme Court overturned the convictions of the Jehovah’s Witnesses for breach of the peace, reasoning that the *276 laws at issue criminalized the family members’ peaceful exercise of their First Amendment liberties. Id. at 310-11, 60 S.Ct. 900. The Court found that there was “no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse.” Id. at 310, 60 S.Ct. 900. The case did not deal with incitement to violence or breach of the peace, much less an actual'altercation.
Finally, the difference between these cases and the instant case is clearest in Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). There, police ordered a group of peaceful protestors to disperse after onlookers became unruly. “When [the officers’] command was not obeyed, [the protestors] were arrested for disorderly conduct.” Id. at 112, 89 S.Ct. 946. The Supreme Court overturned the ensuing criminal convictions. Id. at 112-13, 89 S.Ct. 946. As the Court made explicit, however, its ruling in that case was based on its understanding that “[the protestors] were charged and convicted for holding a demonstration, not for a refusal to obey a police officer.” Id. In a footnote the Court added that “[n]either the ordinance nor the charge defined disorderly conduct as the refusal to obey a police order.” Id. at n. *. Gregory is thus inapposite, because the Bible Believers were threatened with a citation, not because of anything they said, but because they asked what would happen if they disobeyed a police officer. Indeed, the video evidence in this case — supplied only by the Bible Believers — shows the reluctance of the police even to threaten citation. The police chief confirmed that the Bible Believers would be cited only after the Bible Believers repeatedly demanded to know “what he would do” if they declined to depart.[1]
In sum, the Supreme Court has consistently distinguished between prosecuting a person for exercising his First Amendment rights — which is unconstitutional — and insisting that a person comply with a police officer’s order to leave the scene of an ongoing physical altercation so as to prevent further injury — which is constitutional. It cannot be that every police officer’s direction to a citizen to do something requires strict scrutiny just because speech is also involved. Strict scrutiny does not apply, for example, to pulling over a truck for a traffic violation just because there was a message on the side of the truck. Nor could strict scrutiny reasonably be applied to telling two brawling teenagers to separate before they get hurt, even if the brawl started with a verbal argument *277 about some issue. Police officers should not be made to pay damages in such circumstances. This case is no different.
Strict scrutiny applies to rules about speech that allegedly could cause a brawl, not to efforts to control a brawl. The Bible Believers spoke loudly and freely throughout the festival for over an hour. Indeed, for some of that time, the presence of police officers actually made it possible for the Bible Believers to speak without being accosted by the crowd. The officers’ instruction to leave, moreover, only occurred once there was an altercation that left one of the Bible Believers bleeding from his head. This is not a case about “the mere possibility of violence.” Ante at 252. The video evidence shows plastic bottles, rocks, and other hard objects such as a milk crate being thrown at the Bible Believers, and not just by children. Indeed, as the majority describes the video, it shows that “a barrage of bottles, eggs, and other debris [was] hurled upon the Bible Believers” and “[a]t some point during the deluge, Israel was struck in the face.” Ante at 289. Violence had broken out when the police stepped in. The only question confronting police at .that time was how to handle it.
It cannot be that, in an altercation where one side is greatly outnumbered but wants to risk injury by standing its ground, police officers are obligated to permit the risk — indeed, must 'put themselves at risk — in the name of the First Amendment. The First Amendment does not compel police to stand by and ignore their duty to protect the public.
Cases like the one before us properly call for a balancing of the speakers’ First Amendment interests and the community’s need for safety and order. Of course, police should not be allowed to treat every outbreak of violence as cover for suppressing speech, and where it is reasonably possible to vindicate a speaker’s First Amendment rights, police should do so. But it will not always be possible to do so, taking into account all of the factors peace officers must consider, such as the nature of the crowd, the resources available to police at the time, and other factors bearing on law enforcement’s ability to control the scene around a speaker. Drawing a rigid line based on abstract doctrinal principles robs police officers of the discretion and judgment that is essential to law enforcement. If the police may stop the altercation, they may do it in a reasonable way, under the circumstances as actually presented. If bringing in a larger police force is not a then-available option in the reasoned view of the peace officer on the scene, separating the parties is reasonable. In the context of this case, separating the parties meant escorting away the less numerous group. This was a practical and reasonable thing to do — not prohibited by the First Amendment, unless the First Amendment rigidly requires peace officers to determine which side threw the first stones or punches, and thereafter to protect the other side as the brawl continues.
When festivalgoers began attacking the Bible Believers, law enforcement officers at the Arab Festival had a choice: attempt to restrain the large and physically abusive crowd, or ask the Bible Believers to leave. The record shows that the officers made efforts to restrain the festivalgoers. Among other things, they ventured into the crowd to identify the individuals who were throwing debris and rocks at the Bible Believers, and issued some warnings and citations. This is not a situation, then, where law enforcement jumped at the first opportunity to evict an obnoxious group. To the contrary, it appears the officers tried to avoid having to evict the Bible Believers.
*278 Despite their efforts, however, the officers ultimately determined that they could not easily stop the altercation while the Bible Believers were present. The officers thus decided to remove the Bible Believers from the festival grounds. The First Amendment does not prohibit that reasonable exercise of judgment, and this conclusion is consistent with Glasson v. City of Louisville, 518 F.2d 899 (6th Cir.1975). In Glasson, police violated the First Amendment by tearing up a protester’s sign after hecklers began grumbling and muttering threats about it from across the street. Id. at 901-02. There was no actual violence in Glasson or even a move toward actual violence. Glasson involved police conduct to preempt potential violence. In contrast, there was nothing potential about the fracas at the Arab Festival.
It is unfortunately ironic for the Bible Believers to succeed in their tactics in this case based on towering but distinguishable cases involving minority civil rights protests. In the greater Detroit community, it is the minority’s cultural expression that loses from today’s decision. The disrup-ters here came from a different part of a larger community to disrupt the First Amendment activity of Arab-Amerieans— a sometimes feared, misunderstood, or despised minority within that larger community. Realistically viewed, the Bible Believers were hecklers seeking to disrupt the cultural fair. The police visibly attempted to reconcile the First Amendment rights of festivalgoers and the Bible Believers. There may have been much better ways for the police to handle this situation, but there was no First Amendment violation.

. Here is an excerpt of the conversation between the police chief and one Bible Believer (“BB"):
BB: Let me ask you this: If we don’t leave, are we gonna get arrested?
CHIEF: Probably.
BB: I just need to know, yes or no.
CHIEF: Probably.
BB: That’s like me probably saying, "Yes, probably we’ll stay around.”
CHIEF: Probably we will cite you all, yes.
I mean, if that’s what you want then, I mean, I don’t, I don’t understand what good that does.
BB: I just need to know if I’m gonna be arrested or not or if you just thought it was a good idea that we walk away. If you’re telling me that we’re gonna get arrested, that’s what I need to know. Are you telling me that we’re gonna get arrested if we ...
CHIEF: I’m not telling you that you're going to get arrested, but, you know, you’re a danger to the public safety. You’re disorderly.
BB: I would assume, you know, two hundred angry Muslim children throwing bottles would be more of a threat than a few guys with signs.
[Brief interlude]
CHIEF: Alright, you need to leave.
BB: Again, I just want to make an ask, so, if we don’t leave, you're saying ...
CHIEF: If you don’t leave, we’re gonna cite you for disorderly.