CLAY, Circuit Judge,
dissenting.
This is an easy case. Plaintiffs Ruben Israel and the Bible Believers came to the 2012 Arab International Festival (“Festival”) to exercise their sincerely held religious beliefs. Those beliefs compelled Plaintiffs to hurl offensive words and display offensive images at a crowd made up predominantly of children. Defendants themselves admit that these words and images were protected by the Constitution. A video shows Defendant Deputy Chief *593 Dennis Richardson telling Israel that the Bible Believers must leave the Festival under pain of arrest because “what you are saying to them [the crowd], and they are saying back to you is creating danger.” This is a clear heckler’s veto, breaching the principle that “hostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker’s message so long as the speaker does not go beyond mere persuasion and advocacy of ideas [but rather] attempts to incite to riot.” Glasson v. City of Louisville, 518 F.2d 899, 905 (6th Cir.1975). The majority reaches the opposite result by misstating the law and slanting the factual record in favor of Defendants, the very parties who moved for summary judgment. The law and the facts do not allow for this result. I therefore respectfully dissent.
I. The First Amendment and Angry Crowds
The First Amendment would hardly be needed if it applied only in a well-mannered marketplace of ideas. Fortunately, the right to free speech includes the right to speak passionately. The First Amendment “may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.” Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The right to free speech also means that “in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.” Boos v. Barry, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quotation marks omitted). These principles do not change just because an outrageous speaker is confronted by an outraged crowd — “[[listeners’ reaction to speech is not a content-neutral basis for regulation.” Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).
The First Amendment therefore does not allow for a “heckler’s veto.” This means that “[participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.” Brown v. Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (plurality opinion). The law could not be otherwise, else “free speech could be stifled by the speaker’s opponents’ mounting a riot.” Zamecnik v. Indian Prairie Sch. Dist. No. 201, 636 F.3d 874, 879 (7th Cir.2011). Therefore, if the state cracks down on a speaker because his constitutionally protected expression stirs listeners to anger, that is a content-based restriction on speech that must survive strict scrutiny. See Forsyth County, 505 U.S. at 135-36, 112 S.Ct. 2395.
However, if a rabble-rousing speaker leaves the First Amendment’s protected confínes, the heckler’s veto principle does not apply. See Glasson, 518 F.2d at 905. We recognize a few limited classes of speech “the prevention and punishment of which have never been thought to raise any Constitutional problem.” Brown v. Entm’t Merchants Ass’n, — U.S. —, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (quotation marks omitted). Two of these areas have particular relevance to the interactions between angry speakers and angry crowds — incitement to violence and fighting words.
The test for incitement was “firmly set out,” James v. Meow Media, Inc., 300 F.3d 683, 698 (6th Cir.2002), in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 *594 L.Ed.2d 430 (1969) (per curiam). There are two elements: the speech must be “directed to inciting or producing imminent lawless action and [ ] likely to incite or produce such action.” Id. at 447, 89 S.Ct. 1827 (emphases added). Under Brandenburg, speech cannot constitute incitement unless the speaker intends lawlessness to result. See James, 300 F.3d at 698.
Fighting words are “those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction.” Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (quotation marks omitted). Fighting words are defined solely by their impact on the “average person,” Sandul v. Larion, 119 F.3d 1250, 1255 (6th Cir.1997), and thus there is no requirement that the speaker intend his words to provoke a violent response. See Cantwell v. Connecticut, 310 U.S. 296, 309-10, 60 S.Ct. 900, 84 L.Ed. 1213 (1940);[1] United States v. Jeffries, 692 F.3d 473, 480 (6th Cir.2012). But because a reasonable listener interprets fighting words as an immediate “invitation to exchange fisticuffs,” Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), only rarely would we find a speaker who hurls these invectives without some sort of intent to start trouble.
If a speaker goes beyond forceful rhetoric and veers into incitement or fighting words (or some other class of unprotected speech), the state can step in and sanction the speaker without raising constitutional concerns. But what if the speaker never utters incitement or fighting words, yet the listening crowd resorts to violence; must the police sit on the sidelines out of respect for the First Amendment? Of course not — “our Constitution, written for the ages, to endure except as changed in the manner it provides, did not create a government with such monumental weaknesses.” Gregory v. City of Chicago, 394 U.S. 111, 125, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring). Police have the ability to reasonably regulate the “time, place, or manner of protected speech,” so long as the police actions are narrowly tailored to ensure the safety of crowd and speaker. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). But if these regulations do not contain the crowd and the threat of violence is extreme, law enforcement may be able to temporarily silence constitutionally protected speech.
This statement invites two follow-up questions: First, how much rowdiness does the First Amendment compel law enforcement to endure; and second, once law enforcement is permitted to step in and curtail speech, who should be the target of their actions — speaker or crowd? The answer to the first question has been framed in various ways, but they all boil down to a similar high standard: the speech must be “likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.” Terminiello, 337 U.S. at 4, 69 S.Ct. 894; see also Cox v. Louisiana, 379 U.S. 536, 552, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 9 L.Ed.2d 697 *595 (1963); Cantwell, 310 U.S. at 308, 60 S.Ct. 900. Absent these conditions, peaceful and orderly speakers cannot be sanctioned.
The second question has historically been more difficult to answer. Justice Frankfurter was of the opinion that “[i]t is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker.” Niemotko v. Maryland, 340 U.S. 268, 289, 71 S.Ct. 328, 95 L.Ed. 280 (1951) (Frankfurter, J., concurring, and also concurring in Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951)). As with much of Justice Frankfurter’s civil rights jurisprudence, however, this statement has never attracted unqualified approval. The Supreme Court appeared to recognize Justice Frankfurter’s error as it was presented with a flood of cases where desegregation demonstrators were arrested for breaches of the peace. These decisions suggest that the principal duty of law enforcement is to protect those exercising their First Amendment rights, and to first attempt to control the lawlessness of others before turning against the speakers. See Erwin Chemerinksy, Constitutional Law 1040 (4th ed.2011) (discussing Edwards, 372 U.S. 229, 83 S.Ct. 680; Cox, 379 U.S. 536, 85 S.Ct. 453; and Gregory, 394 U.S. 111, 89 S.Ct. 946). The police, after all, are constitutionally required to show restraint when faced with protected speech, even hostile speech. See City of Houston, Tex. v. Hill, 482 U.S. 451, 471-72, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). It follows that officers’ principal duty is to protect the lawful speaker over and above the lawless crowd-the police “must take reasonable action to protect from violence persons exercising their constitutional rights.” Glasson, 518 F.2d at 906; see also Zamecnik, 636 F.3d at 879; Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1299 (7th Cir.1993). The exception to this rule was Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), a case where the Court affirmed the conviction of a protestor who was urging, in front of a “mixed audience,” that African Americans “rise up in arms and fight for equal rights.” Id. at 317, 71 S.Ct. 303. However, the Court also held that the speaker had “passe[d] the bounds of argument or persuasion and undertake[n] incitement to riot.” Id. at 321, 71 S.Ct. 303. Before being disinterred by the majority and the district court, we had confined Feiner to the truism that when a speaker incites a crowd to violence, his incitement does not receive constitutional protections. See Glasson, 518 F.2d at 905 n. 3.
It does not take much to see why law enforcement is principally required to protect lawful speakers over and above lawbreakers. If a different rule prevailed, this would simply allow for a heckler’s veto under more extreme conditions. Indeed, hecklers would be incentivized to get really rowdy, because at that point the target of their ire could be silenced. More perniciously, a contrary rule would allow police to manufacture a situation to chill speech. Police officers could simply sit by as a crowd formed and became agitated. Once the crowd’s agitation became extreme, the police could swoop in and silence the speaker. The First Amendment does not contain this large a loophole.
In our circuit, we have clarified how officers should react in these situations— where the speaker is protected, but the crowd is rowdy — by announcing a good faith defense:
Ideally, police officers will always protect to the extent of their ability the rights of persons to engage in First Amendment activity. Yet, the law does not expect or require them to defend the *596 right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection without having to respond in damages. Accordingly, whether a police officer must respond in damages for his actions is judged by whether his conduct was reasonable, considering all the circumstances, and by whether he acted in good faith. A police officer’s stated good faith belief in the necessity or wisdom of his action is not dispositive of that element of the defense, but must be supported by objective evidence.
Glasson, 518 F.2d at 909. A few notes about the defense. First and foremost, the standard is objective good faith and reasonableness. As discussed above, an officer acting in good faith will more often than not attempt to protect the law-obeying from the law-breakers. We noted in Glasson that officers acting in good faith “may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection.” Id. (emphasis added). But it does not follow that anytime an officer removes a speaker, he is necessarily acting reasonably and with objective good faith. Second, the good faith defense does not even come into play until protecting the speaker “unreasonably subject them [that is, the police] to violent retaliation and physical injury.” Id. Glasson therefore presupposes that officers must make an effort to place themselves between the crowd and the speaker, and that this duty only falls away once the officers themselves face serious threats of injury. If officers never place themselves in harm’s way — never make any attempt to protect the speaker — it would be difficult to say that they exercised their duties in good faith.
With this framework in mind, the case before us essentially resolves itself. Plaintiffs’ speech was protected by the First Amendment, as Defendants concede. Despite this fact, Plaintiffs were threatened with arrest because of the reaction of the crowd to Plaintiffs’ sermonizing. This is a heckler’s veto. I would leave to the jury the matter of whether Defendants acted reasonably and in good faith, although the evidence in the record compellingly suggests that they did not.
The majority reaches the opposite result on each of these issues. First, the majority announces that Plaintiffs incited the crowd to violence — in other words, that Plaintiffs’ speech was not protected by the First Amendment. We know this because the majority relies heavily on the discredited Feiner, which we have cabined to “situation[s] where the speaker in urging his opinion upon an audience intends to incite it to take action.” Glasson, 518 F.2d at 905 n. 3 (emphasis added). The majority also states baldly that Plaintiffs’ “speech and conduct incited the crowd to turn violent.” Maj. Op. at 590. Second, the majority implicitly concludes that the good faith defense from Glasson applies as a matter of law. Id. at 589-91. The majority is wrong on both counts.
II. Plaintiffs’ Speech was Protected by the First Amendment
The majority’s first error is its conclusion that the First Amendment did not protect Plaintiffs’ speech. This is not only wrong, it is dangerously wrong.
A. Defendants Have Waived Any Argument that Plaintiffs’ Speech Was Not Protected
Any debate as to whether Plaintiffs’ expression was protected should be a short *597 one — Defendants have clearly and repeatedly waived the argument that Plaintiffs incited the crowd. As stated above, if speech constitutes incitement (or fighting words), it is not protected by the First Amendment as a general rule. It follows that if Defendants conceded that Plaintiffs’ expression was protected, they necessarily conceded that the expression did not rise to the level of incitement. Defendants did precisely this. They did it before the district court. See Bible Believers v. Wayne County, No. 12-CV-14236, 2013 WL 2048923, at *6 n. 7 (E.D.Mich. May 14, 2013). And they did it repeatedly on appeal, emphasizing that they “previously agreed that the activities at issue are protected by the Free Speech clause of the First Amendment,” and that Plaintiffs’ “continued arguments that their speech is protected are redundant, as this was already agreed to by the parties at the district court level.” Appellees’ Br. at 20, 28 n. 10. Defendants have therefore waived any argument that Plaintiffs’ speech was not protected by the First Amendment— including an argument that their expression constituted incitement or fighting words. See Sommer v. Davis, 317 F.3d 686, 692 (6th Cir.2003).
Had Defendants expressly argued that Plaintiffs incited the crowd, they (and the majority) would have had to come to grips with the cases establishing the metes and bounds of incitement. As Defendants only vaguely argue incitement, they are able to do so in a vague and incomplete legal landscape. Anyone reading the majority’s opinion, Maj. Op. at 589-91, would think that the last word on the meaning of incitement can be found in Feiner. This could not be more wrong. Feiner continues to be good law for the proposition that if a speaker incites a crowd to violence, he cannot benefit from the heckler’s veto doctrine. See Glasson, 518 F.2d at 905 n. 3. But the facts of Feiner simply do not constitute incitement as that doctrine has evolved over the past 60 years. See supra at 593-94; 5 Rotunda & Nowak, Treatise on Constitutional Law § 20.39(a) (5th ed.2013); 1 Smolla & Nimmer on Freedom of Speech § 10:41 (2014).
As explained below, Defendants cannot show that Plaintiffs’ expression violated the First Amendment when faced with the true law of incitement and fighting words. I would therefore take Defendants at then-word and hold that they cannot argue that Plaintiffs’ speech fell outside the protections of the First Amendment.
B. Plaintiffs’ Speech Did Not Constitute Incitement or Fighting Words
The tests for incitement and fighting words are clear and exacting. Speech cannot constitute incitement unless the speaker intends the speech to produce imminent lawlessness, and the speech is likely to produce that result. See James v. Meow Media, Inc., 300 F.3d 683, 698 (6th Cir.2002). Fighting words are only those few select utterances “likely to cause an average person to react [by] causing a breach of the peace.” Sandul v. Larion, 119 F.3d 1250, 1255 (6th Cir.1997). The facts in the record simply do not allow for either of these First Amendment exceptions to apply-
Plaintiffs spewed hateful and bigoted words during the course of their sermonizing, but there is no statement in the record that we can point to as clear evidence of intent to incite the listening crowd to riot. Plaintiffs’ speech cannot be said to have advocated in favor of crowd violence. Contra United States v. Williams, 553 U.S. 285, 299-300, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Plaintiffs did not give the crowd detailed instructions on how to break the law. Contra United States v. *598 Fullmer, 584 F.3d 132, 155 (3d Cir.2009); Rice v. Paladin Enters., Inc., 128 F.3d 233, 249-50 (4th Cir.1997); United States v. Freeman, 761 F.2d 549, 551-52 (9th Cir.1985) (Kennedy, J.). Plaintiffs did not seek to enlist the crowd to carry out a criminal act on Plaintiffs’ behalf. Contra United States v. White, 610 F.3d 956, 960-61 (7th Cir.2010) (per curiam). And we cannot objectively say that the greatly outnumbered Bible Believers conveyed a threat (other than the distant threat of God’s damnation) with their proselytizing. Contra United States v. Jeffries, 692 F.3d 473, 478 (6th Cir.2012). Even assuming that Plaintiffs’ speech contained violent imagery — depictions of suffering that awaited the crowd in hell — the First Amendment would still protect it. See Glenn v. Holder, 690 F.3d 417, 421-22 (6th Cir.2012).
Plaintiffs’ speech does not constitute fighting words any more than it constitutes incitement. Plaintiffs’ words were not likely to prompt an “average person ” to respond with violence. Sandul, 119 F.3d at 1255 (emphasis added). To reach this conclusion, we need do nothing more than look at the video — the average person at the Festival did not meet Plaintiffs with violence. To hold that Plaintiffs’ words meet the fighting words test, we would need to amend the standard from “average person” to “average Muslim child,” as if such a person existed. Moreover, the First Amendment strongly counsels that we should not allow the state to criminalize speech on the grounds that it is blasphemous — even so blasphemous that the average adherent to the offended religion would react with violence. See Leonard v. Robinson, 477 F.3d 347, 359-60 (6th Cir.2007). “[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them.” Epperson v. Arkansas, 393 U.S. 97, 107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (quotation marks omitted); see also Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 (3d Cir.2001) (Alito, J.) (“[T]here is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another’s race or national origin or that denigrate religious beliefs.”).
C. The Majority Reaches Its Conclusion by Reading the Facts in Favor of Defendants
It is hard to piece out, but the majority appears to hold that Plaintiffs incited the crowd based on three facts. First, Plaintiffs began sermonizing “[wjithin minutes” of their arrival at the Festival. Maj. Op. at 590. Second, Plaintiffs’ sermonizing was “extremely aggressive and offensive.” Id. And third, the majority vaguely references Plaintiffs’ “conduct.” Id. Before addressing these facts, the reader should be reminded of one fact the majority has apparently forgotten — this is an appeal from Defendants’ motion for summary judgment, and we must construe all facts in the light most favorable to Plaintiffs. See Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
Once we look at the majority’s facts through this lens, it becomes impossible to say that Plaintiffs incited the crowd. Yes, Plaintiffs began preaching as soon as they arrived at the Festival, and yes, their sermonizing was offensive. Plaintiffs have a response to these accusations. Israel has stated under penalty of perjury that, based on his “sincerely held religious beliefs, [he is] required to preach the Gospel of Jesus Christ, to try and convert non-believers, and to call sinners to repent.” (R. 20-2, Israel Deck, at 174.) Israel’s “street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes” are simply an embodiment of his religious conviction. (Id.) The *599 majority effectively dubs Plaintiffs’ religious beliefs a fig leaf for their true purpose at the Festival — causing trouble. Courts should step very gingerly before making adverse factual findings about a person’s religious convictions. Cf. Burwell v. Hobby Lobby Stores, Inc., — U.S.—, 134 S.Ct. 2751, 2778, 189 L.Ed.2d 675 (2014) (“This argument ... addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable).”).
The majority’s reliance on Plaintiffs’ unspecified conduct is equally specious. Presumably, the majority refers to the fact that Plaintiffs moved through the crowd as they sermonized. No one doubts that once a rowdy crowd formed, Defendants could have regulated Plaintiffs in an attempt to accommodate both Plaintiffs’ right to free speech and the orderly operation of the Festival. See Startzell v. City of Philadelphia, Pa., 533 F.3d 183, 197 (3d Cir.2008). But Plaintiffs’ conduct provided no grounds for criminal sanction — Plaintiffs were not jaywalking, obstructing traffic, or committing some other petty offense that would have allowed Defendants to take action. See Cox, 379 U.S. at 554-55, 85 S.Ct. 453. Plaintiffs’ conduct only becomes an issue when it is paired with their protected speech. Calling speech “conduct” does not make it so.
Finally, the existence of a video of (a portion of) the Festival does not change our analysis of the record. In Scott v. Hams, the Supreme Court instructed that we should not accept one party’s version of the facts when it “is blatantly contradicted by the record, so that no reasonable jury could believe it.” Scott, 550 U.S. at 380, 127 S.Ct. 1769. There, the Court rejected the nonmovant’s version of how carefully a fleeing suspect had driven a car in light of the objective facts revealed in a video of the chase. See id. at 379-80, 127 S.Ct. 1769. The key fact in our case, by contrast, is the question of Plaintiffs’ intent. That is not a fact shown on the videotape — it is an idea that existed in the mind of the speakers. Jurors might conceivably find an intent to incite based on inferences drawn from Plaintiffs’ sermonizing. We judges are prohibited from doing so.
The law and the facts in the record simply do not support the majority’s conclusion that Plaintiffs’ speech was not protected by the First Amendment. At best, we could say that this is a question for the jury. But there is no basis for the option the majority selected — to rule as a matter of law that Plaintiffs’ sermonizing was not entitled to the protections of the First Amendment. Because Plaintiffs’ speech was protected, and because the threat to arrest Plaintiffs was explicitly founded on the crowd’s reaction to their speech, we have a heckler’s veto.
III. We Cannot say that the Good Faith Defense Applies as a MatteR of Law
I now turn to the majority’s second erroneous conclusion — that Defendants are entitled to the Glasson good faith defense. As a reminder, the individual Defendants will only be entitled to this defense if protecting the speaker “unreasonably subjected] them to violent retaliation and physical injury.” Glasson, 518 F.2d at 909. Above all, Defendants must have acted reasonably and -with objective good faith. See id. The record is replete with factual disputes that prevent us from ruling for Defendants on either of these grounds.
First, unlike the majority, the district court, and both parties, I do not see an incipient riot when I view the video of the Festival. The crowd listening to Plaintiffs was made up predominantly of children. Their volume and rambunctiousness do not *600 appear much different from other groups of sugar-addled youngsters at a carnival. Throwing debris — mostly plastic bottles by the looks of things — is inappropriate, perhaps criminal, but does not evidence an unreasonable threat to life and limb. The more serious crimes, such as throwing rocks, appear to have happened just a few times. I do not dispute that the crowd became angry and agitated. But a fan-look at the video shows that the crowd maintained its composure. Indeed, the most contentious altercation captured on film was an argument about the relative merits of the Islamic and Christian methods of prayer. Perhaps this was not a marketplace of ideas, but it was at least a trading floor for them.
Second, I see little evidence that Defendants behaved reasonably and with objective good faith as they dealt with the situation before them. To find that Defendants acted reasonably, the majority puts a pro-Defendant gloss on several key facts. The majority sees officers “hover[ing] at the edges of the crowd,” and even sees “some mounted units[ ] attempting] to quell the crowd.” Maj. Op. at 584. I saw no such police presence — apart from a few officers standing around doing next to nothing. As for the mounted units, they simply rode through the crowd at one point, making no obvious attempt to “quell” anything. Further, the majority apparently accepts Defendants’ contentions that they did not have enough officers at the Festival to provide any security for Plaintiffs whatsoever. I seriously doubt that Defendants would have needed a sizeable police presence to control a crowd of children. But even if more officers were needed, the record suggests that those officers were available. Defendants themselves aver that they dedicate more police to the Festival than they do to a presidential visit or the World Series. There were also enough officers on hand for about a dozen of them to mill about Plaintiffs’ van as it was stopped for not having a license plate.
In my view, the video tape shows that Defendants did just about nothing to control the crowd as it grew and became agitated. Defendants only stepped in to inform Plaintiffs that the police were powerless and that Plaintiffs needed to leave under threat of arrest. This is not good faith — it is manufacturing a crisis as an excuse to crack down on those exercising their First Amendment rights. Jurors, not judges, should decide this issue.
Regrettably, law enforcement officers have a track record of chilling the free speech rights of proselytizers at the Festival. See Saieg v. City of Dearborn, 641 F.3d 727, 740-41 (6th Cir.2011). The majority’s holding in this case effectively undermines this Circuit’s prior holdings which have sought to protect First Amendment interests in Dearborn under difficult circumstances. See id. at 740.
CONCLUSION
The majority misstates the law and misconstrues the facts to hand this case to Defendants. The First Amendment protects Plaintiffs’ speech, however bilious it was. As for the good faith defense, there are too many issues of fact to be resolved on summary judgment — especially on Defendants’ motion for summary judgment. The majority retreats from our commitment in Saieg to the principle that the First Amendment cannot be shut out of the Festival, and by so doing provides a blueprint for the next police force that wants to silence speech without having to go through the burdensome process of law enforcement. I expect we will see this case again.

. The majority reads Cantwell to mean that speech can constitute incitement even if the speaker does not intend to provoke violence. Maj. Op. at 589-90. The majority thus waives Brandenburg out of existence and ignores subsequent Supreme Court cases that have tied the cited portion of Cantwell to the fighting words doctrine. See Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam) (citing Cantwell, 310 U.S. at 309, 60 S.Ct. 900); Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (citing Cantwell, 310 U.S. at 309, 60 S.Ct. 900).